# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KAREN KELLEY, ISRAEL BARAJAS, ERIN ENGLUND, CHRISTINE LIGHTNER, and MICHAEL DUPREE, individually and each as representatives of a class of similarly situated individuals, | No.  1:24-cv-05945-JAV |
| *Plaintiffs,* | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, TIAA-CREF INDIVIDUAL & INSTITUTIONAL SERVICES, LLC, TIAA TRUST, N.A., MORNINGSTAR INVESTMENT MANAGEMENT, LLC, MORNINGSTAR INVESTMENT SERVICES, LLC, and MORNINGSTAR, INC., | JURY TRIAL DEMANDED |
| *Defendants.* | |

## I.  INTRODUCTION

1.      This action arises from an ongoing unlawful scheme to enhance corporate profits committed by Defendants TIAA-CREF Individual & Institutional Services, LLC ("TC Services"), TIAA Trust N.A. ("TIAA Trust"), and their corporate parent, Teachers Insurance and Annuity Association of America (individually and collectively "TIAA"), as well as Defendants Morningstar Investment Management, LLC, Morningstar Investment Services, LLC, and their corporate parent, Morningstar, Inc. (individually and collectively "Morningstar").

2.      Beginning in or about 2013, upon realizing that its share of the market for retirement plan services was eroding, that demographic trends would soon lead to a steep drop in revenues, and that its flagship product, the TIAA Traditional Annuity, was experiencing negative net asset flows, TIAA, together with Morningstar, developed an investment advice tool—known as the **Retirement Advisor Field View ("RAFV") tool**—that would increase the flow of assets into two of TIAA's most profitable proprietary investment vehicles: the TIAA Traditional Annuity and the TIAA Real Estate Account.

3.      A critical component of the scheme was for TIAA to leverage its position as a recordkeeper to employer-sponsored plans, in order to gain access to participants and make investment recommendations that favored its own products.

4.      For participants in TIAA recordkept plans, Defendants developed two services that utilize the RAFV tool. The first was an investment advice service known as **TIAA Retirement Advisor ("RA")**, which allowed participants to access the RAFV tool online, over the phone, or in person through on-site TIAA financial consultants. The second was a managed account service known as **TIAA Retirement Plan Portfolio Manager ("RPPM")**, which followed the recommendations of the RAFV tool in managing participants' accounts.

5.      At all times relevant to this Complaint, Morningstar has subadvised the RA and RPPM services.

6.      TIAA and Morningstar operate as fiduciaries when providing investment advice to plan participants using the RAFV tool. As fiduciaries, TIAA

and Morningstar are duty bound under the law to act prudently and loyally when making investment recommendations to participants.

7. In RA and RPPM, Defendants represented that they were providing participants with Morningstar's independent and unbiased advice. Those representations were materially false and misleading.

8. Unbeknownst to participants, Defendants had deliberately designed the RAFV tool to favor two of TIAA's most profitable investment products: the TIAA Traditional Annuity and the TIAA Real Estate Account. Regardless of the participant's individual circumstances, the RAFV tool was coded to recommend an allocation to the TIAA Traditional Annuity in six out of seven recommended models. The RAFV tool was similarly designed to recommend an 8% or 9% allocation to the TIAA Real Estate Account for every participant.

9. In 2021, TIAA was sanctioned by the U.S. Securities and Exchange Commission and the New York Attorney General for using fraudulent sales tactics to induce participants with high account balances to roll their assets into TIAA's expensive non-plan products. Within months of settling those claims, TIAA began placing a greater emphasis on the RAFV tool implementations.

10. Since 2023, TIAA has directed its financial consultants to conduct outreach to approximately 650,000 plan participants whose investment portfolios were "underweighted" to TIAA's proprietary annuities, and to utilize the RAFV tool to get those underweighted participants back "on track" for retirement. This process inevitably involves Defendants recommending, among other things, that

3

participants reallocate their investments more heavily in the TIAA Traditional Annuity and/or the TIAA Real Estate Account.

11.    To qualify for certain year-end bonus awards, TIAA financial consultants are required to meet a quota for persuading a certain number of participants to implement the increased allocations to the TIAA Traditional Annuity and the TIAA Real Estate Account recommended by the RAFV tool.

12.    By falsely telling participants that the recommendations in the RA and RPPM programs are those of an objective, unbiased, and trusted third-party (i.e., Morningstar), and by designing the RAFV tool to favor TIAA's two most important products, Defendants have succeeded in convincing plan participants across the country to invest a portion of their retirement savings in the TIAA Traditional Annuity and/or the TIAA Real Estate Account.

13.    Defendants have been unjustly enriched from their unlawful scheme, at the expense of employees and retirees.

14.    Defendants' unlawful conduct described herein and the resulting harm to retirement plan participants are both ongoing.

15.    Through their dishonest actions to benefit themselves at participants' expense, TIAA and Morningstar are violating their fiduciary duties under the Employee Retirement Income Security Act of 1974 (ERISA)—duties which are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)—as well as ERISA's prohibited transaction rules. *See* 29 U.S.C. § 1106.

16. Defendants are also knowingly participating in fiduciary breaches by the employers and plan sponsors, who have been derelict in their ERISA fiduciary duties by allowing TIAA to engage in rampant self-dealing using plan assets.

17. Defendants are also executing their unlawful scheme on participants in non-ERISA plans, such as those sponsored by public universities, in violation of their fiduciary duties under New York common law.

18. Defendants are failing to act in the best interests of plan participants by recommending allocations to TIAA's proprietary funds in every case for TIAA's benefit, without considering whether such investments are in the best interest of any given participant.

19. Defendants fraudulently concealed their breaches of fiduciary duty and prohibited transactions, as the facts contained herein were only recently brought to light by whistleblowers in news reports.

20. To obtain redress for Defendants' misconduct, Plaintiffs each bring this action on behalf of themselves and proposed classes of similarly situated individuals.

21. Plaintiffs and members of the proposed classes seek an order requiring Defendants to make good all losses sustained by class members, disgorging Defendants' ill-gotten profits, and enjoining Defendants from continuing their unlawful scheme. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2)–(3).

## II.  JURISDICTION AND VENUE

22.     **Subject-matter jurisdiction.** This Court has original jurisdiction over the ERISA claims brought herein pursuant to 29 U.S.C. §§ 1132(a)(2) and (a)(3), as they arise under federal law and raise a federal question. *See* 28 U.S.C. § 1331. This Court also has supplemental jurisdiction over the New York state common law claims brought herein, as they are so related to the ERISA claims that they form part of the same case or controversy under Article III of the U.S. Constitution. *See* 28 U.S.C. 1367(a). Exercising supplemental jurisdiction over the state law claims raised in this action will advance the values of judicial economy, convenience, fairness, and comity. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006).

23.     **Venue.** Venue is proper in the Southern District of New York, because it is the district where at least one of the alleged breaches or violations took place, and where at least one defendant resides or may be found. *See* 29 U.S.C. § 1132(e)(2); 28 U.S.C. § 1391(b).

24.     **Standing.** Plaintiffs and the members of the two proposed classes were defrauded and sustained damages and financial losses as a result of Defendants' breaches of fiduciary duty and other violations of ERISA, and those injuries may be redressed by a judgment of this Court. But for Defendants' misconduct, the assets in Plaintiffs' and class members' retirement plan accounts would have had been invested in better-performing and lower-cost investments and would not have been subject to the excessive and unreasonable fees and inferior

investment performance of the TIAA Traditional Annuity and the TIAA Real Estate Account. But for Defendants' misconduct, TIAA and Morningstar would not have been unjustly enriched through fees and expenses assessed against Plaintiffs' and class members' investments in the TIAA Traditional Annuity and the TIAA Real Estate Account.

25.   Plaintiffs and all class members have standing to pursue remedies to prevent Defendants from retaining the benefit of their unlawful actions, which is one proper measure of injury or damages. Plaintiffs and all class members also have standing to seek disgorgement or a constructive trust on TIAA's and Morningstar's ill-gotten profits realized as a result of their breaches of the duties of prudence and loyalty and their prohibited transactions. *See Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock*, 861 F.2d 1406, 1409–19 (9th Cir. 1988).

### III. PARTIES

**A.   Plaintiffs**

26.   **Karen Kelley** lives in Billerica, Massachusetts. She worked in the Cooperative Education Department of Northeastern University before retiring in 2023. Kelley is currently a participant[1] in the Northeastern University Basic Retirement Plan, an ERISA-governed 403(b) defined contribution retirement plan that includes TIAA investment products and utilizes TIAA as its recordkeeper.

---

[1] ERISA defines "participant" as "any employee or former employee … who is or may become eligible to receive a benefit of any type from an employee benefit plan … or whose beneficiaries may be eligible to receive any such benefit." 29 U.S.C. § 1002(7).

27. In April 2022, as part of TIAA's Retirement Advisor program, Kelley met with a TIAA financial advisor who recommended that she increase her allocation to the TIAA Traditional Annuity from 17.88% to 22% of her total plan investment, based on the RAFV tool. Kelley subsequently implemented the advisor's recommendation, which was made during and in furtherance of the Defendants' unlawful scheme described herein. As of June 30, 2024, Kelley had 21.67% of her total plan investments in the TIAA Traditional Annuity.

28. **Israel Barajas** lives in Philadelphia, Pennsylvania, where he works as the Executive Director of Marketing Strategy for University Marketing and Communications at Drexel University. He participates in his employer's ERISA 403(b) retirement plan and also has TIAA investments in another ERISA plan sponsored by his former employer, Thomas Jefferson University. Both plans are recordkept by TIAA.

29. Barajas met with TIAA financial consultants on two occasions: once in March 2021 while he was working at Thomas Jefferson University, and again more recently in July 2024 while working at Drexel. During both meetings, and in furtherance of the unlawful scheme described herein, the TIAA financial consultant recommended that Barajas change his ERISA plan investments from target date funds to an investment mix that included an allocation to the TIAA Real Estate Account (9% and 8%, respectively), based on the RAFV tool. In both instances, Barajas accepted the consultant's advice.

8

30.    TIAA documentation provided to Barajas in July 2024 indicated that the "specific fund-level advice" was "provided by Morningstar Investment Management," "an independent financial expert[.]"

31.    If Barajas had remained invested in the target date fund that he was invested in prior to this recommendation, the Nuveen Lifecycle Index 2045 Premier, by November 2024, every dollar he invested would have increased to $1.36. Instead, because he accepted the RAFV tool's recommended lineup, the value of each one-dollar investment he made over that span increased to only $1.34. While that difference may appear small for a single dollar, such small differences in gains over time can cost participants like Barajas thousands of dollars in lost savings at retirement.

32.    **Erin Englund** lives in Sahuarita, Arizona. She is the Director of Recruitment for the College of Agriculture, Life & Environmental Sciences at the University of Arizona, where she participates in her school's non-ERISA 403(b) defined contribution retirement plan. Englund also participates in two non-ERISAs plans provided by her former employer, State University of New York at New Paltz. She also owns a Roth IRA. All of her retirement plans are recordkept by TIAA.

33.    In December 2022, as part of TIAA's Retirement Advisor program, Englund had a virtual meeting with a TIAA financial consultant. During the meeting, in furtherance of the unlawful scheme described herein, the consultant recommended she divest from a T. Rowe Price target date fund in her University of

Arizona plan and invest instead in a mix of other investments, including an 8% allocation to the TIAA Real Estate Account, based on the RAFV tool.

34.    TIAA documentation provided to Englund in December 2022 indicated that the "specific fund-level advice" was "provided by Morningstar Investment Management," "an independent financial expert[.]"

35.    Assuming that the consultant was acting in her best interests, Englund accepted the recommendation. She currently holds at least an 8% allocation to the TIAA Real Estate Account in each of her TIAA retirement plans.

36.    If Englund had remained invested in the target date fund that she was invested in prior to this recommendation, the T. Rowe Price Retirement 2050 Trust, by November 2024, every dollar she invested would have increased to $1.44. Instead, because she accepted the RAFV tool's recommended lineup, the value of each one-dollar investment she made over that span increased to only $1.33. While that difference may seem small for a single dollar, such small differences in gains over time can cost participants like Englund thousands of dollars in lost savings at retirement.

37.    **Christine Lightner** lives in Pinckney, Michigan, where she works as a Senior Administrative Assistant at the University of Michigan School for Environment and Sustainability. Lightner currently participates in two non-ERISA retirement plans offered by the University of Michigan—a 403(b) plan and a 401(a) plan—both of which are recordkept by TIAA.

38.     In June 2024, as part of TIAA's Retirement Advisor program, Lightner had a virtual meeting with a TIAA financial consultant to discuss her plan investments. During the meeting, in furtherance of the unlawful scheme described herein, the consultant recommended that she move out of a target date fund and into a mix of other investments, including a 7% allocation to the TIAA Traditional Annuity and a 9% allocation to the TIAA Real Estate Account, based on the RAFV tool. Lightner accepted the consultant's recommendations.

39.     TIAA documentation provided to Lightner in June 2024 indicated that the "specific fund-level advice" was "provided by Morningstar Investment Management," "an independent financial expert[.]"

40.     **Michael Dupree** lives in Ann Arbor, Michigan, where he works as a Project Manager Planner in the University of Michigan's High Voltage Department. Dupree currently participates in two non-ERISA retirement plans offered by the University of Michigan—a 403(b) plan and a 401(a) plan—both of which are recordkept by TIAA.

41.     In March 2017, as part of TIAA's Retirement Advisor program, Dupree had a meeting with a TIAA financial consultant to discuss his plan investments. During the meeting, in furtherance of the unlawful scheme described herein, the consultant recommended that Dupree move out of a target date fund and into a mix of other investments, including a 7% allocation to the TIAA Traditional Annuity and a 9% allocation to the TIAA Real Estate Account, based on the RAFV tool. The consultant also recommended that he move to RPPM, which moved his assets,

primarily invested in a target date fund, to a mix of other investments, including a 7% allocation to the TIAA Traditional Annuity and a 9% allocation to the TIAA Real Estate Account. Dupree accepted the consultant's recommendation to move to RPPM and continued investing in the RPPM program through 2019, paying additional fees for the RPPM service during that time.

**B.    Defendants**

42.    **Teachers Insurance and Annuity Association of America** ("TIAA") is a legal reserve life insurance company established under the insurance laws of the State of New York in 1918. Its headquarters and principal place of business is in New York, NY. TIAA's clients include thousands of defined contribution plans which utilize TIAA's investment options (annuities and mutual funds) and administrative services, such as recordkeeping of participants' accounts. Examples of ERISA-governed plans serviced by TIAA include the Yale University Retirement Account Plan and the New York University Retirement Plan for Members of the Faculty, Professional Research Staff and Administration.

43.    **TIAA-CREF Individual & Institutional Services, LLC** ("TC Services") is a wholly owned subsidiary of Teachers Insurance and Annuity Association of America. TC Services is a Delaware limited liability company with its headquarters and principal place of business in New York, NY, and a registered broker-dealer under the Securities Exchange Act of 1934, as well as an investment advisor under the Investment Advisers Act of 1940. TC Services has been providing

12

investment advisory services and investment management services to individuals through its Advice and Planning Services division since 2004.

44.    TC Services provides a brokerage service known as TIAA Retirement Advisor, which purports to provide investment recommendations from Morningstar, a purportedly independent third party, using the Retirement Advisor Field View ("RAFV") tool. As of December 31, 2023, TC Services' advisory division had approximately $32.7 billion in assets under discretionary management.

45.    **TIAA Trust, N.A.** ("TIAA Trust") is a wholly-owned subsidiary of TIAA and a national trust bank regulated by the U.S. Department of Treasury, Office of Comptroller of the Currency. Its headquarters and principal place of business is in Charlotte, NC. In addition to providing deposit and loan products, TIAA Trust serves as a corporate fiduciary. The majority of its fiduciary business is managing investment account assets. TIAA Retirement Plan Portfolio Manager is a discretionary fee-based asset allocation advisory program provided by TIAA Trust.

46.    The unlawful actions described herein attributed to TIAA were the result of a coordinated effort by TIAA, TC Services, and TIAA Trust, with all three entities acting in concert to achieve the same unlawful objective. Accordingly, unless otherwise specified, the three entities are referred to collectively throughout this Complaint simply as "TIAA."

47.    **Morningstar, Inc.** is an American financial services firm headquartered in Chicago, IL, that offers a wide array of products and services to both retail and institutional investors, including retirement plan providers.

13

Founded in 1984, Morningstar, Inc. provides investors with data, research, and fund ratings, as well as investment management services and advisor tools and platforms, among other products and services. *See* Morningstar, Inc. 2023 Form 10-K at 23.[2] In 2023, Morningstar, Inc. reported over $2 billion in revenue. *See id.* at 7.

48.    Through its Morningstar Retirement segment, Morningstar, Inc. offers products including managed retirement accounts, fiduciary services, allocation funds, and custom models. *Id.* at 34. As of December 31, 2023, Morningstar Retirement was responsible for $230.4 billion in assets under management or advisement. *Id.*

49.    **Morningstar Investment Management, LLC** is a registered investment adviser and subsidiary of Morningstar, Inc. with its headquarters and principal place of business in Chicago, IL. Morningstar Investment Management LLC purports to provide TIAA with independent, third-party asset allocation models and specific investment recommendations for the TIAA Retirement Advisor and TIAA Retirement Plan Portfolio Manager programs.

50.    **Morningstar Investment Services, LLC** is a wholly-owned subsidiary of Morningstar, Inc., registered in Delaware, with its headquarters and principal place of business in Chicago, IL. Morningstar Investment Services LLC is a registered broker-dealer under the Securities Exchange Act of 1934 and a registered investment adviser under the Investment Advisers Act of 1940. During

---

[2] Available at https://s21.q4cdn.com/198919461/files/doc_financials/2023/ar/Annual-Report-2023.pdf

the relevant time period, Morningstar Investment Services, LLC was a subadvisor for both TIAA Retirement Advisor and TIAA Retirement Plan Portfolio Manager.

51.    The unlawful actions described herein attributed to Morningstar were the result of a coordinated effort by Morningstar, Inc., Morningstar Investment Management, LLC, and Morningstar Investment Services, LLC, with all three entities acting in concert to achieve the same unlawful objective. Accordingly, unless otherwise specified, the three Morningstar entities are referred to collectively throughout this Complaint simply as "Morningstar."

## IV.  GENERAL BACKGROUND

### A.    Defined contribution plans

52.    An employer-sponsored retirement plan may be classified as a defined benefit plan or a defined contribution plan. A defined benefit plan is a traditional pension; the employee is guaranteed a specified monthly payment and the risk of loss falls on the employer who is responsible for ensuring that the plan has sufficient assets to meet its obligations for benefit payments. In contrast, a defined contribution plan shifts the risk of loss to the employees. "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). Plaintiffs and the class members are participants in defined contribution plans.

53.    In a defined contribution plan, participants contribute pre-tax earnings (often matched by the employer up to a certain percentage) into an individual account and direct the contributions into one or more options on the plan's

investment lineup, which is assembled by the plan's fiduciaries. "[P]articipants'

retirement benefits are limited to the value of their own individual investment

accounts, which is determined by the market performance of employee and

employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523, 525

(2015).

54.    "Expenses, such as management or administrative fees, can sometimes

significantly reduce the value of an account in a defined-contribution plan." *Id.* The

Department of Labor has illustrated that a 1% difference in fees reduces the

average worker's account balance by 28% after 35 years. *See* Figure 1. In dollar

terms, this fee differential adds up to nearly $500,000 after 40 years.

**Figure 1**

How Fees Erode Account Balances Over Time

**B.    Managed accounts and investment allocation advice**

55.    Managed accounts are investment services under which providers make investment decisions for participants to allocate their retirement savings among a mix of asset classes, commonly referred to as an asset allocation.

56.    To create plan participants' asset allocations in defined contribution plans, managed account providers limit the investment options they consider to the funds chosen by the plan sponsor for the plan. Thus, managed account service providers create a fund of a plan's funds for plan participants.

57.    Most managed account service providers, including TIAA and its competitors, utilize computer programs to create plan participants' asset allocations. Representatives can modify client-directed inputs but cannot modify outputs and recommendations from the software program.

58.    Plan participants can allocate any percentage of their portfolio or contributions to managed account services.

59.    Managed account service providers act as fiduciaries with respect to the investment advice their software systems provide retirement plan participants. If managed accounts are included in a defined contribution plan, their inclusion, like other investment options, must be the result of a prudent selection process, and their fees must be reasonable.

60.    Plan fiduciaries can contract directly with a managed account provider to offer managed account services to plan participants. Alternatively, some

17

managed account providers use "subadvised" arrangements to offer their services through a recordkeeper.

61.    Plan fiduciaries can also contract with multiple managed account providers, only incurring a fee if participants utilize the managed account services.

62.    Recordkeepers, like TIAA, can provide a data feed to multiple managed account service providers in order to provide managed account services to a defined contribution plan.

## C.    In-plan investment advice tools

63.    In addition to managed accounts, service providers such as TIAA often provide in-plan advice tools, which are supposed to help participants in a defined contribution plan determine how to allocate their investments in the plan.

64.    In contrast to managed accounts, where an investment professional makes decisions on behalf of the participant, in-plan advice tools merely provide recommendations, which participants can decide to execute on their own.

65.    The investment advice is typically conveyed in one of two ways. In some plans, participants can go to a website and input information into an online investment advice tool, which then returns specific allocation recommendations. Some providers also offer in-person or phone consultations with investment advisors, who receive information from participants and provide them with the allocation advice. One or both of these investment advice options may be available to participants in a given plan.

18

66.     As with all service providers, fiduciaries must prudently select and monitor investment advisers for plan assets, including those offering managed account services or individual advice services, though they do not have a fiduciary duty to monitor the individual advice given to "any particular recipient."[3]

67.     When selecting an investment adviser, fiduciaries must follow an "objective process" to evaluate "the experience and qualifications of the investment adviser, including the adviser's registration in accordance with applicable federal and/or state securities laws, the willingness of the adviser to assume fiduciary status and responsibility under ERISA with respect to the advice provided to participants, and the extent to which advice to be furnished to participants and beneficiaries will be based upon generally accepted investment theories."[4]

68.     "The process also must avoid self dealing, conflicts of interest or other improper influence."[5]

69.     After the initial selection process, fiduciaries must "periodically review" investment advisers and managed account providers by considering similar information anew.[6]

70.     Consistent with guidance published by the U.S. Department of Labor, industry professionals who advise defined contribution plans also recommend that

---

[3] U.S. Dep't of Labor, Field Assistance Bulletin No. 2007-01 at 2–5.

[4] *Id.* at 5.

[5] *Id.*

[6] *Id.* at 5–6.

19

fiduciaries periodically look at the portfolio constructions and performance of managed accounts, to ensure that they are consistent with industry norms.[7]

71.    As discussed below, the hard-coding of the TIAA Real Estate Account into every portfolio and the TIAA Traditional Annuity into nearly every portfolio deviated significantly from Modern Portfolio Theory, as well as the allocations made by most professional managers of multiple asset allocation solutions.

72.    The recommendations of the RAFV tool have significantly underperformed most asset allocation recommendations made by professional managers of multiple asset allocation solutions.

73.    In light of these deficiencies, and considering the clear conflicts of interest inherent in TIAA's recommendations, prudent fiduciaries would not have chosen the RA or RPPM services for their plans. If their plans already included RA or RPPM services, prudent fiduciaries would have removed those services from their plans after a periodic review.

**D.    Annuities**

74.    Annuities are generally structured as either fixed or variable instruments. Fixed annuities, like the TIAA Traditional Annuity, provide regular

---

[7] *See, e.g.*, Mercer, *Complexities in personalization: Monitoring managed account solutions* at 3, available at https://www.mercer.com/assets/us/en_us/shared-assets/local/attachments/pdf-2023-monitoring-managed-account-solutions.pdf; Defined Contribution Institutional Investment Association (DCIIA), *Managed Accounts, Due Diligence and Implementation Considerations* at 3, 6 (Sept. 2020), available at https://cdn.ymaws.com/dciia.org/resource/resmgr/resource_library/ManagedAccountsPaper2_092920.pdf?utm_source=Informz&utm_medium=Email&utm_campaign=Informz&_zs=DDiLa&_zl=hLcG2.

periodic payments to the annuitant. Variable annuities, like the TIAA Real Estate Account, are sometimes called insurance mutual funds. They allow the owner to receive larger future payments if the fund's investments do well and smaller payments if they do poorly. This provides for less stable cash flow than a fixed annuity, but it also allows the annuitant to reap the benefits of strong returns.

75.     In order to receive lifetime periodic payments, the holder of a variable annuity must affirmatively elect to annuitize; otherwise, the variable annuity continues acting like a mutual fund. Studies have shown that only a small percentage of plan participants reaching retirement age annuitize their variable annuity.

76.     When a participant annuitizes all or a portion of their investment balance, they enter into a contractual agreement with an insurance company. This contract is a promise by the insurance company to pay a certain monthly income for a certain period, usually the lifetime of the participant. At the time the participant annuitizes, they trade market risk (the risk of their investment decreasing over time) to the insurance company in exchange for a promise to pay, backed by the financial health of the insurance company.

77.     Annuities can be purchased using either pre-tax or after-tax dollars. An annuity purchased with pre-tax dollars is known as a "qualified" annuity. Contributions to qualified annuities are deducted from an investor's gross earnings and, along with investments, grow tax-free. Neither the contributions nor the earnings are subject to federal taxes until after retirement, when the individual

begins receiving distributions. At that point, the distributions are taxed as ordinary income.

78.   Saving for retirement by investing in a tax-sheltered qualified annuity made more sense before sections 401(k) and 403(b) of the Internal Revenue Code were enacted. Today, a plan participant can take advantage of the same tax-deferred growth when purchasing any mutual fund offered within a qualified defined contribution plan. This means that the "accumulation phase" for both variable annuities and mutual funds is the same; owning a qualified annuity within a tax-deferred retirement plan provides no additional tax benefit. Furthermore, because annuities typically come with higher fees, their returns generally accumulate at a lower rate than a comparable, lower-cost mutual fund.

79.   Most 401(k) defined contribution plans do not offer annuities as an investment option during the accumulation phase. Participants who want to ensure a steady stream of income in retirement can purchase a lifetime annuity from a variety of different insurance companies at the "withdrawal phase," without having to purchase a higher cost annuity within a qualified retirement plan.

80.   A prudent investment advisor would encourage participants interested in purchasing an annuity to ask for lifetime income quotes from different insurance companies—not just the annuity included in a retirement plan or annuities offered by vendors in the plan. For example, Hueler Investment Services, Inc. ("Hueler") offers the Income Solutions annuity marketplace, where individuals can "compare features on low-cost, competitively bid annuity products from multiple top-rated

22

insurance companies, and choose the income annuity best suited to [their] personal financial needs." Utilizing resources like Hueler can help ensure plan participants invest in annuities with competitive expense structures and fair actuarial assumptions.

81.     A prudent investment advisor would also explain to participants that annuitization has substantial risks that must be considered and counterbalanced. The income originally calculated when the participant annuitized could be worth less in the future, due to inflation. Annuitizing may also reduce the amount of wealth immediately available for unanticipated health costs or emergencies, or that could otherwise be left to beneficiaries or heirs. And there is always a risk that the insurance company cannot pay the promised amount.

82.     Since 2000, the percentage of participants in TIAA-serviced plans choosing to begin a life annuity immediately following retirement has declined steadily for both men and women of all ages. In 2018, only about 30% of retired TIAA participants had a life annuity as part of their retirement income distribution.[8]

83.     **The TIAA Traditional Annuity** is a fixed annuity contract that returns a contractually specified minimum interest rate with a right to annuitized payments. Assets invested in the TIAA Traditional Annuity are backed by the

---

[8] https://www.tiaa.org/content/dam/tiaa/institute/pdf/infographic/2022-03/trends-in-retirement-infographic.pdf.

23

general account of TIAA and are dependent upon the claims-paying ability of TIAA. As of December 31, 2023, the balance of the TIAA general account was $294 billion.

84.     Fixed annuities, like the TIAA Traditional Annuity, generally do not have set expense ratios. Rather, the annuity provider places investors' money in the general account of the provider. The provider then invests the general account money and keeps the "spread," which is the difference between the return of the general account and the crediting rate for the annuity. The spread on the TIAA Traditional represents approximately 90% of TIAA's annual revenue.

85.     The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments. It is the most illiquid fixed annuity on the market. Most varieties of the TIAA Traditional Annuity are subject to a 10-year put, meaning that, prior to annuitization, assets can be withdrawn only in 10 annual installments over 10 years. The Retirement Choice (RC) version of the TIAA Traditional Annuity similarly requires withdrawals, transfers, and rebalances to be paid only in 84 monthly installments over 7 years. In some cases, a lump sum withdrawal may be available 120 days after retirement, but TIAA applies a costly 2.5% surrender charge.

86.     As of June 30, 2024, the average annual total return of the TIAA Traditional Annuity (RA) over the past 10 years was 3.93%.

87.     It is TIAA's position that assets held in most of its annuities are not controlled by the fiduciaries and therefore cannot be transferred without the

24

consent of individual participants in plans.[9] One court has described TIAA's position as putting fiduciaries in a "hostage-type situation."[10] Because of TIAA's position, fiduciaries have been forced to retain TIAA annuity investments in their plans or freeze those assets, subjecting the participants who remain invested in them to potentially higher fees.[11]

88.    **The TIAA Real Estate Account** is an insurance company separate account maintained by TIAA. It is a variable annuity product, with allocations to domestic commercial real estate, real estate investment trusts (REITs), and liquid fixed income investments. As of June 30, 2024, the Account had total net assets of $22.5 billion.[12]

89.    Unlike real estate mutual funds, which invest in publicly-traded real estate investment funds, the TIAA Real Estate Account invests directly in commercial office buildings and other real property. Because those properties cannot be quickly sold, the Account also holds a significant percentage of assets in cash or cash equivalents, to provide liquidity.

90.    The TIAA Real Estate Account is TIAA's most expensive variable annuity product, with a net expense ratio of at least 87 basis points (bps). Unlike

---

[9] TIAA, TIAA and CREF contract comparison, available at https://www.tiaa.org/public/pdf/RC_ComparisonGrid_8_fin.pdf.

[10] *Cates v. Trs. of Columbia Univ.*, No. 16-06524 (GBD) (SDA), 2019 U.S. Dist. LEXIS 186573, at *24 (S.D.N.Y. Oct. 25, 2019).

[11] Plaintiffs do not agree or concede that TIAA's position complies with ERISA or the terms of the annuity contracts.

[12] https://fluenttech.tiaa.org/pdf/factsheet/878094200.pdf.

other TIAA investments, there are no share classes of the TIAA Real Estate Account.

91.    The expense ratio of the TIAA Real Estate Account currently includes four layers of fees; in the past, it has had as many as five layers. As of April 30, 2024, these charges consisted of the following:

- "Administration" (25 bps);
- "Distribution" (4.5 bps);
- "Mortality and Expense Risk" (0 bps);
- "Liquidity Guarantee" (28 bps); and
- "Investment Management" (29.5 bps).

92.    Because of its unique underlying portfolio characteristics, benchmarking the TIAA Real Estate Account can be difficult. However, the Account's large cash position has historically led to a significant performance drag compared to mutual funds investing in REITs. In 2023, the TIAA Real Estate Account generated a trailing 12-month total return of negative 13.62%.[13] Its average annual total return over the past 5 years, as of June 30, 2024, was 1.35%. The Account is currently down 4.7% year to date.

93.    There are many superior options available in the market that offer investors exposure to the real estate market. The Vanguard Real Estate Index Fund (Admiral shares), for example, is a low-cost mutual fund that invests exclusively in REITs, has a net expense ratio of 13 bps, and yielded a total average annual return

---

[13] https://www.tiaa.org/public/pdf/reports/tiaa_realestate10Q.pdf at 22.

of 2.96% over the same 5-year period.[14] The BlackRock Real Estate Securities (Institutional) fund costs 75 bps and has generally outperformed its peers and index over the past 10 years. It is up 6% year to date, which is on par with its 10-year annual average. A real estate fund managed by Cohen & Steers is up 9.35% for the past 12 months and averaged a 5.8% gain in each of the past five years. These and other real estate funds have generally outperformed the TIAA Real Estate Account across reporting periods.

## V.  BACKGROUND ON TIAA

### A.    TIAA dominates the higher education market.

94.    Founded in 1918, TIAA has historically marketed itself to higher education retirement plans. Over many decades, together with its companion, College Retirement Equities Fund (CREF), TIAA has totally dominated the market for services to retirement plans sponsored by colleges and universities, as well as other nonprofit employers. Today, nearly 80% of assets invested for retirement in higher education are held at TIAA.

95.    TIAA's business has two main parts. First, it acts as recordkeeper for the retirement plans of institutions like New York University, Cornell University, the State University of New York, and most of the nation's 107 historically Black colleges and universities. TIAA currently has over 12,000 institutional clients whose plans total approximately 4.7 million individual participants. Second, TIAA earns

---

[14] https://investor.vanguard.com/investment-products/mutual-funds/profile/vgslx#performance-fees.

27

money as an asset manager for TIAA-affiliated investment products, including fixed and variable annuities and mutual funds.

96.    In many cases, as part of its recordkeeping service, TIAA provides investment advice to participants in its retirement plan clients through its financial consultants, who meet with participants by phone or in-person.

97.    As of June 30, 2024, TIAA had approximately $1.3 trillion in total assets under management, including $294 billion[15] in its flagship Traditional Annuity and $126 billion in the CREF Stock variable annuity.

## B.    TIAA operates as a for-profit company.

98.    TIAA has publicly proclaimed in marketing materials and elsewhere that it "has operated without profit over the past 100 years." *See, e.g.*, Br. for TIAA as Amicus Curiae at 5, *Sweda v. Univ. of Pa.*, No. 17-3244, 923 F.3d 320 (3d Cir. 2019). However, in 1998, Congress revoked the tax-deductible 501(c)(3) charitable organization status of TIAA because it "competed directly with for-profit insurance companies and mutual fund groups."[16]

99.    Today, TIAA is organized as a *for-profit* stock life insurance company. TIAA owns and controls numerous for-profit subsidiaries, which send dividends to

---

[15] This is the amount in the TIAA general account that underlies the TIAA Traditional.

[16] Reed Abelson, *Budget Deal to Cost T.I.A.A.-C.R.E.F. Its Tax Exemption*, N.Y. Times (July 30, 2007), http://www.nytimes.com/1997/07/30/business/budget-deal-to-cost-tiaa-cref-its-tax-exemption.html.

TIAA. An example is Nuveen Investments, a for-profit investment manager, which TIAA acquired in April 2014 for an enterprise value of $6.25 billion.

100.    The compensation of TIAA's CEO and other executives is on par with or exceeds what executives are paid at some of Wall Street's largest for-profit investment managers and insurance companies.

101.    TIAA's five highest-ranking "named executive officers" earned a combined total of over $46 million in compensation in 2023.

102.    In 2023, the median compensation for CEOs of companies in the S&P 500 was $15.6 million. That same year—in the midst of the fraudulent scheme at issue herein—TIAA's CEO, Thasunda Brown Duckett, received $18.2 million in total compensation, comparable to the CEO of Prudential ($19.2 million), $2.3 million more than the CEO of UBS ($15.9 million), and over $5 million more than the CEOs of T. Rowe Price ($12.8 million) and Deutsche Bank ($12.7 million). TIAA's CEO had one of the highest compensation rates among peers as a percentage of assets under management. *See* Figure 2.

29

**Figure 2**



### C.    Changes to 403(b) plans put financial pressure on TIAA.

103.    Nearly all of TIAA's retirement plan business comes from plans sponsored by non-profit organizations and entities, such as universities and hospitals. These plans are commonly organized under section 403(b) of the Internal Revenue Code. *See* 26 U.S.C. § 403(b).

104.    Before 2007, many in the industry believed that 403(b) plans were subject to an exemption from ERISA's fiduciary requirements under a "safe-harbor" regulation, based upon limited employer involvement in those plans. *See* 29 C.F.R. §2510.3-2(f). Because of this, many 403(b) plan sponsors exercised very little fiduciary oversight over the plans and allowed recordkeepers, like TIAA, to fill them with their proprietary products. Thus, it was TIAA, not the fiduciaries, that made the decision to include TIAA annuities in TIAA-recordkept plans.

105.    In July 2007, the Internal Revenue Service issued new regulations that required plan sponsors to take more control over 403(b) plans. 26 C.F.R. §1.403(b)-0, *et seq*. Among other things, the final regulations required 403(b) plans to be maintained under a "written defined contribution plan" containing all the material terms and conditions for benefits under the plan. 26 C.F.R. §1.403(b)-3. DOL separately published revised Form 5500 annual reporting rules effective January 1, 2009, that required large ERISA-covered 403(b) plans to file audited financial statements providing detailed information about the assets in the plan. *See* 72 Fed. Reg. 64731. Based on these new regulations, it became clear that 403(b) plans could no longer fall within any "safe harbor" from ERISA's fiduciary duties.

106.    Once the regulations were published, some non-profit plan sponsors whose 403(b) programs previously qualified for the safe-harbor determined they would have to comply with ERISA's fiduciary requirements by the regulations' effective date of January 1, 2009. As a result, the fiduciaries of many 403(b) plans implemented dramatic overhauls to their plans and acknowledged that these changes were necessary to comply with the IRS regulations and to satisfy their fiduciary obligations under ERISA.

107.    For example, after 2008, many 403(b) fiduciaries who had been using multiple recordkeepers consolidated to a single recordkeeper and began conducting regular, competitive bidding for recordkeeping services. In September 2006, plan participants began bringing legal actions under ERISA against their plan sponsors for allowing their recordkeepers to charge excessive fees. These events "led to

31

enormous fee savings for plan participants" and a sharp drop in recordkeeping revenues for TIAA and other providers. *See Marshall v. Northrop Grumman Corp.*, No. 16-6794 (AB), 2020 U.S. Dist. LEXIS 177056, at \*12 (C.D. Cal. Sep. 18, 2020); *see also Cates v. Trs. of Columbia Univ.*, No. 1:16-cv-06524-GBD, 2021 U.S. Dist. LEXIS 200890, at \*15–16 (S.D.N.Y. Oct. 18, 2021) (noting that undersigned counsel's "fee litigation and the Department of Labor's fee disclosure regulations approach $2.8 billion in annual savings for American workers and retirees") (citation omitted).

108.   Many 403(b) fiduciaries also began scrutinizing the investment options in the plan, streamlining the number of investment options and eliminating imprudent ones. 403(b) fiduciaries also began hiring outside consultants to assist them in monitoring fees and investments. This increasingly led 403(b) plans to replace TIAA and CREF investment options with funds managed by TIAA's competitors, like Vanguard, BlackRock, and Fidelity.

109.   Even after the 2007 regulations, TIAA retained significant influence over the fund lineups of some of its retirement plan clients. For example, the 2012 investment menu of the State of Rhode Island 401(a) Plan "was jointly developed between TIAA-CREF and the SIC (State Investment Commission.)"[17]

---

[17] Rhode to Retirement Program, Defined Contribution Retirement Plan Transition Guide at 16 (2012).

**D.    TIAA begins to lose market share.**

110.    Beginning in or about 2009, as a result of the changes described above, TIAA began to lose recordkeeping clients and assets in their proprietary investment options. From 2013 to 2014, for example, a total of $6.4 billion in client assets left TIAA in favor of competitors, including $1.3 billion in assets from the University of Notre Dame, which switched from TIAA to Fidelity.

111.    Demographic trends at the time further showed that a large segment of participants in TIAA-administered plans and TIAA propriety investments—the baby-boomer generation—were nearing retirement. These new retirees were increasingly likely to move their retirement assets to other providers.

112.    Based on these threats, TIAA projected in 2011 that unless it developed new strategies, its net asset flows would become negative as of 2018.

**E.    TIAA turns to unlawful activity to make money.**

113.    In or about 2012, as it faced daunting financial challenges, TIAA developed a scheme to prevent further losses to competitors and increase its profitability. The scheme involved expanding TIAA's individual advisory business and driving more assets directly into its most profitable proprietary investment products, including products outside retirement plans.

114.    The centerpiece of TIAA's strategy for out-of-plan products was to aggressively market its managed account program, called "**Portfolio Advisor**." [18]

---

[18] TIAA's marketing of products outside the plan is the subject of another lawsuit and only provided as background to its illicit conduct in this case.

Portfolio Advisor places the investor in a model portfolio of investments, which usually include proprietary TIAA products.

115.   TIAA used high pressure sales tactics, misrepresentations regarding its fiduciary status, and its "non-profit legacy" to convince participants with high account balances to roll some or all of their investments out of their low-cost defined contribution plans and into TIAA's higher-cost outside proprietary products. This was done primarily through TIAA wealth advisors, whose compensation was partially determined by the sale of complex products outside the retirement plans, including TIAA IRAs, insurance products, and wealth management.

**F.    Regulators sanction TIAA.**

116.   In 2020 and 2021, TIAA was forced to discontinue its unlawful conduct due to an investigation led by the U.S. Securities and Exchange Commission (SEC) and the New York Attorney General's Office (NYAG). The parties settled on July 13, 2021. TC Services was ordered to pay a $9 million fine to the SEC and return roughly $74 million in fees plus an additional $14 million in pre-judgment interest to approximately 20,000 former or current clients who opened a Portfolio Advisor account using assets from a TIAA-administered retirement plan between January 1, 2012 and March 30, 2018.

117.   This $97 million penalty was not all. On February 16, 2024, the SEC issued another order against TC Services. It found that between June 30, 2020 and November 1, 2021, TC Services violated federal law when making recommendations to customers to open TIAA IRA accounts, by failing to disclose that lower cost

34

versions of the same TIAA investment options were available in their plans' optional brokerage window. The SEC concluded that TC Services failed to act in its customers' best interests, and that nearly 6,000 TC Services retail customers paid more than $900,000 in expenses they could have avoided. TC Services was ordered to cease and desist its unlawful activities, disgorge over $1 million in fees and prejudgment interest, and pay a civil penalty of $1.25 million.

118.  After TIAA was forced to shut down its illicit marketing of out-of-plan products by the SEC and NYAG investigations, rather than laying off the people who had participated in the illegal schemes, it reassigned many of the managers of its Wealth Management division to roles overseeing TIAA's on-site financial consultants, who advise participants in TIAA recordkept plans.

## VI.  THE UNLAWFUL SCHEME

### A.    TIAA and Morningstar develop the RAFV tool.

119.   In or about 2013, TIAA partnered with Morningstar to create an advice and planning tool known as the **Retirement Advisor Field View ("RAFV")** tool.[19] The RAFV tool is framed as a device to help participants with various risk tolerances determine how to allocate their in-plan investments to achieve their retirement goals. It asks participants a series of questions seeking certain information, such as current salary, total net worth, planned retirement age, and

---

[19] The RAFV tool is technically the name of the interface that consultants access when providing investment advice, while the version participants see online is called "Retirement Advisor." There is no substantive difference between the two. To avoid unnecessary confusion, the complaint refers to it simply as the RAFV tool.

marital status. Based on these and other factors, the RAFV tool estimates an after-tax, monthly retirement income goal for the participant.

120.    In many instances, by design, the RAFV tool will show that the participant is not on track to meet the monthly income goal with their current investment allocations. When that happens, the tool generates recommendations for how the participant can change their plan investments and/or their investment allocations to generate higher estimated income in retirement. Morningstar provides the model portfolios recommended to participants, based on a given plan's investment lineup.

121.    Morningstar and TIAA both accept that the investment recommendations generated by the RAFV tool involve fiduciary conduct under ERISA § 3(21), 29 U.S.C. § 1002(21), and are subject to ERISA's fiduciary responsibility provisions. In a public video, TIAA explains that it "accept[s] fiduciary responsibility for the investment advice offered" in Retirement Advisor, and that "Morningstar's guidance is not influenced by TIAA in any way."[20] In their other marketing materials, Defendants describe Morningstar as an "independent financial expert" to TIAA, within the meaning of the U.S. Department of Labor Advisory Opinion 2001-09A.

---

[20] *See* https://www.tiaa.org/public/video/retirement-advisor.

**1.    The RAFV tool favors two of TIAA's proprietary annuities.**

122.    Rather than operating in its proclaimed role as an independent expert, Morningstar allowed TIAA to have substantial input in the development of the RAFV tool, to favor TIAA's own proprietary annuities.

123.    At TIAA's direction, Morningstar custom designed the RAFV tool to include two unconventional investment categories that Morningstar does not use with any other client: guaranteed income and direct real estate.

a.    The guaranteed income category comprises investments that provide a guaranteed payout, such as fixed annuities. In the RAFV tool, the only investment option available in the guaranteed income category is the TIAA Traditional Annuity.

b.    The direct real estate category consists of funds that invest directly in commercial real estate; funds with indirect ownership, such as real estate investment trusts (REITs), have their own category. Morningstar agreed to create this new category knowing that, in the RAFV tool, the only investment option available in the direct real estate category is the TIAA Real Estate Account.

124.    The RAFV tool generates recommendations for how a participant's assets should be allocated among approximately 16 different asset categories, including direct real estate and guaranteed income. The recommended allocations vary across seven different risk-based scenarios: (1) very conservative; (2)

37

conservative; (3) moderately conservative; (4) moderate; (5) moderately aggressive; (6) aggressive; and (7) very aggressive.

125. By design, and regardless of a client's age, income goal, risk tolerance, or expected retirement date, the RAFV tool marketed to clients as "objective" and "unbiased" will recommend an 8% or 9% allocation to direct real estate (i.e., the TIAA Real Estate Account) in all 7 risk-based scenarios, and an allocation to guaranteed income (i.e., the TIAA Traditional Annuity) ranging from 7% to 40% in 6 out of 7 scenarios.

126. TIAA and Morningstar regularly review the RAFV tool allocations to ensure that no other available investment options are included within the same asset categories as the TIAA Traditional Annuity and the TIAA Real Estate Account.

127. The TIAA Real Estate Account and the TIAA Traditional Annuity are the only two investment options that are "hard coded" in this way into the RAFV tool. In all other categories, there are multiple investment options, including non-proprietary products, that could be recommended.

128. Nearly all of TIAA's client plans include the TIAA Traditional Annuity and/or the TIAA Real Estate Account in their investment lineups.

**2.    TIAA uses the RAFV tool in its advice service and in managed accounts that charge an additional fee.**

129. TIAA utilizes the RAFV tool in two optional services available to its client plans: Retirement Advisor and Retirement Plan Portfolio Manager.

130.    **Retirement Advisor ("RA")** is a brokerage and investment advisory service provided by TC Services. Participants can meet with a financial consultant in person or by phone or access the RAFV tool on their own over the internet. In either case, RA purports to provide "a personalized retirement action plan with savings and investment recommendations."[21]

131.    In the RA program, TIAA and Morningstar provide investment recommendations generated by the RAFV tool, and it is up to the participant to decide whether or not to implement the recommended changes.

132.    Clients using the RAFV tool to change their portfolio must accept all its suggestions; the tool does not allow a participant to accept one recommendation on stocks and reject another on real estate, for example.

133.    The costs of the RA service are included in the fees charged to the plan; participants do not have to pay any additional fees to utilize the RA service.

134.    **Retirement Plan Portfolio Manager ("RPPM")** is a managed account service administered by TIAA Trust. Participants hire TIAA to make the recommended changes generated by the RAFV tool on their behalf, along with any future adjustments that may be warranted.

135.    In the RPPM program, Morningstar accepts ERISA 3(21) fiduciary responsibility for the investment recommendations generated by the RAFV tool,

---

[21] https://www.tiaa.org/public/retire/retirement-planning.

and TIAA accepts ERISA 3(38) fiduciary responsibility as a discretionary investment manager.

136.   Participants pay extra asset-based fees to enroll in the RPPM service, typically 30 basis points, which are paid directly or indirectly to Defendants.

137.   For both RA and RPPM services, Morningstar uses the RAFV tool to build portfolios and makes recommendations on asset classes and fund selections using the plans' existing lineups.

138.   As part of the unlawful scheme described herein, TIAA induces plan sponsors to advertise and promote the RA and RPPM services to their participants, which encourages participants to trust Defendants' investment advice. This is particularly true because participants know their employer has already chosen TIAA to be the recordkeeper for their plan.

### 3.   TIAA's success relies heavily on its most profitable annuities.

139.   TIAA first began implementing the RAFV tool in or about 2013. By then, the 403(b) landscape had begun changing, and many TIAA recordkept plans included non-proprietary investment options, including mutual funds offered by Vanguard, BlackRock, and Fidelity. This further reduced TIAA's revenue, as TIAA does not make money on those competitor products.

140.   In recent years, the number of plan sponsors that have removed TIAA-affiliated investment products from their plans and replaced them with funds offered by TIAA's competitors has only grown. In many plans, the only revenue-

generating TIAA products that remain in the investment lineup are the TIAA Traditional Annuity and the TIAA Real Estate Account.

141.  Since 2013, the RAFV tool has helped TIAA convince plan participants to reallocate some of their retirement savings away from competitor products and back to TIAA by consistently recommending allocations to the TIAA Traditional Annuity and/or the TIAA Real Estate Account in every case.

142.  Over the past decade, TIAA has been able to remain profitable thanks in large part to continued flows into the TIAA Traditional Annuity and the TIAA Real Estate Account from participants in its client plans.

143.  TIAA's executives know that TIAA's financial success depends on the health and continued viability of the TIAA Traditional Annuity and the TIAA Real Estate Account.

144.  Increasing asset flows into the TIAA Traditional Annuity is particularly important to TIAA, as those new investments go into the TIAA general account, which produces roughly **90%** of TIAA's annual revenue.

145.  TIAA also benefits financially from the fact that, as described above, the TIAA Traditional Annuity is "illiquid" in 3 contract types (RA, GRA, and RC). The illiquidity comes from the onerous restrictions TIAA imposes on withdrawals, locking up the funds for up to 10 years, with no ability of participants to remove their money from the fund without significant penalties. This helps ensure that participant savings remain invested and generating income for TIAA. It is an effective method of "asset retention."

41

**B.    TIAA incentivizes financial consultants to execute the scheme.**

146.   In 2022, after being enjoined by the SEC from illegally selling non-plan products and wealth management to plan participants, and being penalized in the amount of $97 million, TIAA began placing a greater emphasis on TIAA Traditional Annuity in-flows in determining annual bonuses for its senior executives.

147.   That same year, in furtherance of the unlawful scheme described herein, TIAA changed the compensation structure of its financial consultants to make their bonuses dependent in part on the number of clients they convinced to implement the RAFV tool's recommendations.

148.   By 2023, as part of their variable compensation "Ticket to Entry," TIAA financial consultants were required to complete "170 RAFV implementations" in order to "activate scorecard points," which represented 20% of the consultants' year-end "grade" or performance evaluation. Those who failed to meet their annual minimum implementation goal (i.e., quota) of RAFV implementations would receive zero points in that category, which would impact their "stack ranking," resulting in significantly reduced variable compensation at the end of the year.

149.   In 2024, TIAA increased the number of RAFV implementations TIAA financial consultants are required to complete for their Ticket to Entry.

**C.    TIAA trains financial consultants to execute the scheme.**

150.   Beginning in or about January 2023, in furtherance of the scheme described herein, TIAA launched an extensive 30-hour training program known internally as "**A New Day for Financial Consultants**." The event was held from

January 31 to February 3, 2023. Hundreds of TIAA financial consultants participated, either virtually or in person in Dallas, Texas.

151.    The objective of "A New Day" was to more effectively encourage participants to "take action" and adopt the recommendations of the RAFV tool, increasing the number of RAFV implementations.

152.    Using the client engagement model, or "**CEM**," TIAA taught its financial consultants how to use certain phrases and approaches to secure participants' commitment to implement the investment recommendations of the RAFV tool. For example, TIAA financial consultants were coached to ask participants how they felt about "the gap" (shown by the RAFV tool) between their current anticipated retirement income and their retirement income goal. The consultants were then supposed to explain the "good news": "if you implement the proposed changes, you can reduce the shortfall." Suggested follow-up questions included the following:

- What is your reaction to that?
- What are your thoughts on the changes in the contribution amounts?
- What is your response to the changes in the allocation?
- How would your spouse feel if you had to delay retirement?

153.    CEM training materials also taught financial consultants the most effective ways to communicate with participants and the best buzzwords to use to reassure participants that the consultant was acting in their best interest, to increase the likelihood that the participant would agree to the recommended

changes. Here is sample language that was provided to consultants as part of the CEM training program:

> We have put you on track to improve your probability of success of reaching your goals. I know that these can be difficult decisions to make, but rest assured, these are topics we help our clients with on a daily basis.

154.    Throughout 2023 and 2024, as a result of the CEM training, TIAA's financial consultants succeeded in persuading participants to implement the RAFV tool's recommendations, thereby increasing asset flows into the TIAA Traditional Annuity and the TIAA Real Estate Account and boosting TIAA's profits.

**D.    TIAA conducts proactive outreach to plan participants "underweight" to the TIAA Traditional Annuity and the TIAA Real Estate Account.**

155.    In or about May or June 2023, a meeting took place in New York where the following TIAA employees were present:

- **Thasunda Brown Duckett** – President & CEO
- **Craig Parkin** – Head of Retirement Advice & Consulting
- **Kourtney Gibson** – Chief Institutional Client Officer
- **W. Dave Dowrich** – Chief Financial Officer
- **Jessica Austin Barker** – Chief Digital & Client Experience Officer

156.    During the meeting, Parkin suggested a new method for increasing TIAA's revenue. He explained that his team had identified approximately 650,000 participants in TIAA client plans who were "off track" for retirement, according to the RAFV tool, because their investment portfolios were "underweight" to the TIAA Traditional Annuity and/or the TIAA Real Estate Account. Parkin proposed "targeting" those participants by having TIAA financial consultants reach out to

44

them, warn them that they are off track for retirement, and offer their advice services to get them back "on track."

157.    According to Parkin, the new proactive outreach campaign he envisioned with the RAFV tool would generate billions of dollars in new revenue to TIAA as a direct result of the anticipated new assets that would flow into the TIAA Traditional Annuity and the TIAA Real Estate Account.

158.    Parkin pitched his proposal to TIAA's CEO, Thasunda Duckett, as a "win-win" situation: the participant would benefit from being back "on track" for retirement, and TIAA would benefit from the additional revenue.

159.    Parkin and the other TIAA executives understood that their own compensation would increase with new investments in the TIAA Traditional Annuity, as a portion of their variable compensation performance evaluations depended in part on "accumulating portfolio net flows into TIAA Traditional."[22]

160.    Duckett immediately indicated her approval of Parkin's proposal and instructed him to provide a detailed written plan within the next few days, including a plan for training the financial consultants to make the necessary outreaches. Parkin followed her instructions and had the documents on Duckett's desk within a week.

161.    The new "**Off Track Manage and Protect**" campaign was first tested on "underweight" participants in the University of Arkansas System, a non-ERISA

---

[22] https://www.tiaa.org/public/pdf/e/exec_comp_policy.pdf at 16.

defined contribution plan. TIAA chose that plan for its pilot program because it felt the business relationship was strong, so that if there was any negative response from participants about the campaign, TIAA would be unlikely to face any serious repercussions.

162.    The pilot program was deemed a success. By August 2023, TIAA financial consultants across the country had begun contacting the rest of the 650,000 targeted "off track" participants, who were referred to internally as "leads." TIAA's stated objective was to "increase advice implementations."

163.    Consultants were expected to contact the participant by phone within 9 days of receiving the lead. TIAA instructed its consultants to reach out to each participant at least twice by phone and once by e-mail "before marking the activity as 'done'." TIAA managers tracked the financial consultants' progress in contacting the leads.

164.    On August 28, 2023, Parkin sent an e-mail to the TIAA Retirement Advice & Consulting ("TRAC") team associates, praising them for their "steady trajectory of improved performance across the board" over the past several months. He further touted internal financial projections, which showed that "we will exceed our full year goals for cumulative Retirement Advisor Field View (RAFV) implementations and Retirement Plan Portfolio Manager (RPPM) adoptions."

165.    On September 22, 2023, a TIAA regional manager sent an e-mail encouraging a group of TIAA financial consultants to continue their "Manage and

Protect" outreaches: 'Your conviction towards engaging participants in Advice and helping them take action is making a huge impact on our mission metric."

166.    TIAA executives, including Parkin, track the additional in-flows to the TIAA Traditional Annuity and the TIAA Real Estate Account generated by the proactive outreach campaign.

167.    By October 2023, TIAA communicated its expectation that financial consultants should complete "5 RAFV Implementations per week."

168.    TIAA's director of finance, Thomas Rajotte, in direct contravention of TIAA's fiduciary duty to work for the exclusive benefit of participants and not for its own interests, told employees that the company could secure its future and offset its losses by selling in-house products to plan participants. "If they have Vanguard," Rajotte said, "we're not earning any money on the product and we're losing money on the recordkeeping." "Where we make that up is on the product side," he explained, with "TIAA proprietary products." He offered Yale University as an example where product sales have "more than [made] up for the loss in recordkeeping revenue."

169.    Over the past year, as Parkin predicted, TIAA's unlawful scheme has succeeded in generating significant new inflows to the TIAA Traditional Annuity and the TIAA Real Estate Account from plan participants like Plaintiffs and the other class members, resulting in greater fees and profits for TIAA and larger bonuses for the TIAA financial consultants who drove the change.

**E.    TIAA's use and description of the RAFV tool is materially false and misleading to participants.**

170.    In publications and through its financial consultants, as part of the unlawful scheme, TIAA falsely represents to plan participants that the investment recommendations generated by the RAFV tool represent "unbiased," "independent," and "objective" advice from a trusted third party, Morningstar. That representation was similarly made during the public testimony of a TIAA representative in 2023 concerning the services TIAA supplied to the retirement plan at Yale University:

> One of the things we did for Yale, did for all our clients, is provide advice to participants about how they would invest their money in the Plan. ... We had an advice tool that we used to deliver that advice to Yale employees and others. The advice that we deliver is based on Morningstar research tools.... And Morningstar, as you might know, is an independent evaluator of investment products. It would be against the law, we wouldn't provide – we provide that advice on an independent developed series of criteria, not criteria developed by Yale, not criteria based by TIAA, but based on this independent platform, which in Yale's case and other retirement plan cases is Morningstar.[23]

171.    TIAA describes its RPPM service as "personalized retirement income planning and investment management, powered by Morningstar's independent, third-party advice."[24] According to TIAA, "[t]he advice, regular reviews and feedback it offers is backed by independent advice from Morningstar." *Id.*

---

[23] Trial Testimony of Douglas Chittenden, *Vellali v. Yale Univ.*, No. 3:16-cv-1345 (D. Ct. June 21, 2023).

[24] https://www.tiaa.org/public/pdf/rppm_faq.pdf at 1.

172.  TIAA's representations to plan participants that the investment advice generated by the RAFV tool is unbiased and independent are materially false and misleading. In particular, TIAA has failed to adequately provide a full and fair disclosure of the following material facts:

a.  TIAA partnered directly with Morningstar to modify the tool for TIAA's client plans, to ensure that it always or nearly always recommends allocations to the TIAA Traditional Annuity and the TIAA Real Estate Account.

b.  TIAA's own proprietary annuities—the TIAA Traditional Annuity and the TIAA Real Estate Account—are the only investment options hard-coded into the RAFV tool; there are no alternative investment options available within the RAFV tool for their respective asset classes.

c.  The financial consultation that includes the supposedly unbiased, objective advice generated by the RAFV tool is carefully scripted to maximize the likelihood of inducing plan participants to increase their allocations to TIAA products, for the financial benefit of TIAA and TIAA's financial consultants.

d.  TIAA financial consultants are financially incentivized to persuade the participants in their client plans to implement the RAFV tool's recommendations.

49

e. The RAFV tool has become the centerpiece of a concerted, nationwide effort by TIAA to increase investment in the TIAA Traditional Annuity and the TIAA Real Estate Account, for TIAA's financial benefit.

173. These facts were at all times and continue to be material to plan participants' decisions to accept the recommendations of the RAFV tool and the TIAA financial consultant.

174. A reasonable person would consider it important to know and understand all of these facts before deciding whether to change their investment allocations.

175. Fully understanding these facts would cause a reasonable person to seriously question the advice being provided, as it shows that the financial consultants are conflicted and not acting in the participants' best interests.

176. The TIAA financial consultants do not explain any of these facts to the participants when conveying their recommendations.

177. Although they do provide participants with certain written disclosures—including excerpts from the most recent TC Services Form ADV filed with the SEC, which contain some information about the conflicts of interest inherent in their recommendations of TIAA products and services—these are typically 40 or 50 pages long and are commonly sent to participants over e-mail during the roughly 40-minute financial consultation. This means that they are typically not seen by the participant, if at all, until after they have already decided to accept TIAA's recommended changes.

50

178.    Even when participants do receive such written disclosures in advance, it is often only by a matter of minutes, which is not enough time for the participants to read and understand them before making a fully informed investment decision.

179.    Accordingly, the written disclosures fail to mitigate the conflicted nature of the advice and do nothing to counteract the false and misleading nature of the RAFV tool.

## F.    Defendants' unlawful scheme is self-serving and disloyal.

180.    In their RAFV tool recommendations, Defendants are not acting solely and exclusively in the best interests of plan participants.

181.    TIAA is motivated primarily by a desire to increase its own profits by steering plan participants to invest more of their savings in TIAA products.

182.    When they encourage participants to accept the investment advice of the RAFV tool, the TIAA financial consultants are motivated primarily by a desire to increase their own compensation, due to the financial incentives imposed by TIAA. This means that they are placing their own self-interest and the interests of TIAA ahead of participants' own best interests.

183.    When it generates the investment recommendations for the RAFV tool, Morningstar knows that in nearly every case it is advising participants to invest in the TIAA Traditional Annuity and the TIAA Real Estate Account, without regard for the participants' individual investment needs. Morningstar allows this to happen because of its strategic business relationship with TIAA, which generates revenue to Morningstar from the RA and RPPM services. A loyal fiduciary acting

51

solely in the interests of plan participants, as Morningstar is required to do, would not agree to assist TIAA in executing this unlawful scheme to enrich itself at participants' expense.

**G.     Defendants' unlawful scheme is imprudent.**

184.    In their RAFV tool recommendations, Defendants are not acting with the care, skill, prudence, and diligence that a prudent person would use under the circumstances.

185.    The RAFV tool's allocations to the TIAA Traditional Annuity and the TIAA Real Estate Account are inconsistent with prudent investment practices.

186.    Multiple asset class investment solutions—like managed accounts, target date funds, asset allocation funds, and on-line investment advisors—design portfolios for investors in retirement plans using mean variance portfolio optimization (or similar optimization) based on Modern Portfolio Theory.[25] Modern Portfolio Theory attempts to find the optimal or most efficient portfolio to produce the maximum expected return for a given level of risk.

187.    Modern Portfolio Theory and mean variance optimization are the accepted portfolio construction techniques used in the investment industry. They are at the core of the Chartered Financial Analyst (CFA®) program.

---

[25] *See, e.g.*, Defined Contribution Institutional Investment Association, Managed Accounts Asset Allocation Review (Nov. 2021) at 3, available at https://cdn.ymaws.com/dciia.org/resource/resmgr/resource_library/ManagedAccounts_Paper4_11042.pdf (discussing the optimization approach of the top five managed account providers).

188.    Professional asset allocation strategies properly using Modern Portfolio Theory and mean variance optimization do not include guaranteed income or private real estate asset classes, much less mandate their inclusion in every or nearly every portfolio regardless of circumstances. For example, the ten largest mutual funds (by assets under management) in Morningstar's[26] target date fund and asset allocation asset classes[27] do not include any guaranteed income investments. Additionally, a survey of managed account providers conducted by industry experts did not include guaranteed income in the asset classes used to compare managed account provider's portfolio recommendations.[28]

189.    On information and belief, the RAFV tool is the only investment advice engine that includes guaranteed income as an asset class.

190.    On information and belief, the RAFV tool is also the only investment advice engine that includes direct real estate as an asset class.

---

[26] As well as providing managed account and investment advice services, Morningstar offers a research platform, Morningstar Direct, that is a common source of data regarding investments for investment professionals.

[27] Those asset classes include: Target Date Retirement Income, Target Date 2030, Target Date 2040, Target Date 2050, and Target Date 2060; Conservative Allocation, Moderately Conservative Allocation, Moderate Allocation, Moderately Aggressive Allocation, and Aggressive Allocation.

[28] Defined Contribution Institutional Investment Association, Managed Accounts Asset Allocation Review (Nov. 2021) at 4–5, available at https://cdn.ymaws.com/dciia.org/resource/resmgr/resource_library/ManagedAccounts_Paper4_11042.pdf (discussing the optimization approach of the top five managed account providers).

191.   The only manager in the top ten target date and asset allocation funds with investments in direct real estate is Nuveen, a subsidiary of TIAA.

192.   Even in TIAA's own Nuveen Lifecycle target date funds, the maximum allocation to direct real estate is only 5.4%, which is less than the 8% or 9% allocation recommended by the RAFV tool for every portfolio.

193.   A survey of managed account providers conducted by industry experts did not include direct real estate in the asset classes used to compare their portfolio recommendations.[29]

194.   There are multiple ways to apply mean variance optimization to a retirement plan lineup. However, compared to the RAFV tool's hard-coded allocations to the TIAA Traditional Annuity and the TIAA Real Estate Account, using mean variance optimization, Modern Portfolio Theory, and the industry average capital market assumptions from the Horizon Actuarial Survey creates superior portfolios that are more efficiently allocated across several asset classes.

195.   While the exact asset allocation recommendations for individual participants will necessarily vary, depending on their personal circumstances, preferences, plan characteristics, and the constraints applied by the investment

---

[29] Defined Contribution Institutional Investment Association, Managed Accounts Asset Allocation Review (Nov. 2021) at 4–5, available at https://cdn.ymaws.com/dciia.org/resource/resmgr/resource_library/ManagedAccount s_Paper4_11042.pdf (discussing the optimization approach of the top five managed account providers).

manager, a more optimized recommendation would generally result in better returns and/or more appropriate levels of risk for participants.

196.    For example, the TIAA Real Estate Account, which has a similar risk profile to equity assets, has underperformed nearly every equity fund in the named Plaintiffs' plans for the last five and ten years.[30]

### University of Arizona System

| Fund | Annualized 5-Year Performance | Annualized 10-Year Performance | 5-Year Performance vs. TIAA Real Estate | 10-Year Performance vs. TIAA Real Estate |
|---|---|---|---|---|
| TIAA Real Estate Account (QREARX) | 0.93% | 3.24% | N/A | N/A |
| Vanguard Extended Market Index (Inst) (VIEIX) | 9.90% | 9.47% | 8.97% | 6.23% |
| Vanguard Institutional Index (Inst Plus) (VIIIX) | 14.51% | 13.09% | 13.58% | 9.85% |
| Vanguard Small-Cap Value Index (Inst) (VSIIX) | 9.91% | 8.68% | 8.98% | 5.44% |
| Vanguard Total International Stock Index (Inst) (VTSNX) | 4.31% | 5.09% | 3.38% | 1.85% |
| CREF Stock Account (R4) (QCSTFX) | 10.36% | 9.68% | 9.43% | 6.44% |
| JPMorgan Large Cap Growth (R6) (JLGMX) | 20.27% | 17.87% | 19.34% | 14.63% |
| JPMorgan Mid Cap Value (R6) (JMVYX) | 8.90% | N/A | 7.97% | N/A |
| MassMutual Mid Cap Growth (I) (MEFZX) | 7.98% | 10.19% | 7.05% | 6.95% |
| MFS Value (R6) (MEIKX) | 8.34% | 8.92% | 7.41% | 5.68% |
| Vanguard Explorer (Adm) (VEXRX) | 9.24% | 10.22% | 8.31% | 6.98% |
| Average Percentage Difference | | | 9.44% | 7.12% |

### Thomas Jefferson University

| Fund | Annualized 5-Year Performance | Annualized 10-Year Performance | 5-Year Performance vs. TIAA Real Estate | 10-Year Performance vs. TIAA Real Estate |
|---|---|---|---|---|
| TIAA Traditional Annuity - Retirement Choice | 4.23% | 4.20% | N/A | N/A |
| TIAA Real Estate Account (QREARX) | 0.93% | 3.24% | N/A | N/A |
| American Funds Capital World Growth and Income (R6) (RWIGX) | 8.91% | 8.57% | 7.98% | 5.33% |
| CREF Global Equities (R3) (QCGLIX) | 11.30% | 9.64% | 10.37% | 6.40% |
| CREF Growth (R3) (QCGRIX) | 17.21% | 15.16% | 16.28% | 11.92% |
| CREF Stock Account (R3) (QCSTIX) | 10.28% | 9.64% | 9.35% | 6.40% |
| Vanguard Emerging Markets Stock Index (Inst) (VEMIX) | 3.02% | 4.03% | 2.09% | 0.79% |
| Vanguard Extended Market Index Fund (Inst Plus) (VEMPX) | 9.91% | 9.48% | 8.98% | 6.24% |
| Vanguard Institutional Index (Inst Plus) (VIIIX) | 14.51% | 13.09% | 13.58% | 9.85% |
| Vanguard PRIMECAP (Adm) (VPMAX) | 12.06% | 12.56% | 11.13% | 9.32% |
| Vanguard Real Estate Index (Inst) (VGSNX) | 3.01% | 5.08% | 2.08% | 1.84% |
| Vanguard Total International Stock Index (Inst) (VTSNX) | 4.31% | 5.09% | 3.38% | 1.85% |
| Vanguard Windsor II (Adm) (VWNAX) | 12.18% | 10.43% | 11.25% | 7.19% |
| Average Percentage Difference | | | 8.77% | 6.10% |

---

[30] Performance as of 12/31/2024. This analysis does not include equity sector funds (other than real estate); regional funds; environmental, social, and governance funds; or asset allocation funds partially invested in equities.

## Drexel University

| Fund | Annualized 5-Year Performance | Annualized 10-Year Performance | 5-Year Performance vs. TIAA Real Estate | 10-Year Performance vs. TIAA Real Estate |
|---|---|---|---|---|
| TIAA Real Estate Account (QREARX) | 0.93% | 3.24% | N/A | N/A |
| Cohen & Steers Institutional Realty Shares (CSRIX) | 4.58% | 6.70% | 3.65% | 3.46% |
| CREF Global Equities Account (R2) (QCGLPX) | 11.23% | 9.57% | 10.30% | 6.33% |
| CREF Growth Account (R2) (QCGRPX) | 17.14% | 15.09% | 16.21% | 11.85% |
| CREF Stock Account (R2) (QCSTPX) | 10.22% | 9.57% | 9.29% | 6.33% |
| DFA Emerging Markets Portfolio (DFEMX) | 3.25% | 4.24% | 2.32% | 1.00% |
| MFS Blended Research Mid Cap Equity (R6) (BMSYX) | 11.64% | N/A | 10.71% | N/A |
| Nuveen International Equity Index (R6) (TCIEX) | 4.83% | 5.38% | 3.90% | 2.14% |
| Nuveen Large Cap Growth (R6) (TILGX) | 16.56% | 15.15% | 15.63% | 11.91% |
| T. Rowe Price Large Cap Growth (I) (TRLGX) | 16.37% | 16.14% | 15.44% | 12.90% |
| T. Rowe Price Large Cap Value (I) (TILCX) | 8.57% | 8.56% | 7.64% | 5.32% |
| Vanguard Emerging Markets Stock Index (Adm) (VEMAX) | 2.98% | 3.99% | 2.05% | 0.75% |
| Vanguard Extended Market Index (Inst) (VIEIX) | 9.90% | 9.47% | 8.97% | 6.23% |
| Vanguard FTSE All-World ex-US Index (Adm) (VFWAX) | 4.39% | 5.12% | 3.46% | 1.88% |
| Vanguard Institutional Index (Inst Plus) (VIIIX) | 14.51% | 13.09% | 13.58% | 9.85% |
| Vanguard International Growth (Adm) (VWILX) | 6.64% | 8.68% | 5.71% | 5.44% |
| Vanguard Real Estate Index (Adm) (VGSLX) | 2.99% | 5.06% | 2.06% | 1.82% |
| Vanguard Small-Cap Index (Inst) (VSCIX) | 9.31% | 9.10% | 8.38% | 5.86% |
| Vanguard Windsor II (Adm) (VWNAX) | 12.18% | 10.43% | 11.25% | 7.19% |
| Average Percentage Difference | | | 8.36% | 5.90% |

## Northeastern University

| Fund | Annualized 5-Year Performance | Annualized 10-Year Performance | 5-Year Performance vs. TIAA Real Estate | 10-Year Performance vs. TIAA Real Estate |
|---|---|---|---|---|
| TIAA Real Estate Account (QREARX) | 0.93% | 3.24% | N/A | N/A |
| Columbia Small Cap Value Fund II (Inst) (CRRYX) | 10.36% | 8.17% | 9.43% | 4.93% |
| CREF Global Equities Account (R3) (QCGLIX) | 11.30% | 9.64% | 10.37% | 6.40% |
| CREF Growth Account (R3) (QCGRIX) | 17.21% | 15.16% | 16.28% | 11.92% |
| CREF Stock Account (R3) (QCSTIX) | 10.28% | 9.64% | 9.35% | 6.40% |
| Delaware Ivy Mid Cap Growth (R6) (IGRFX) | 8.38% | 10.30% | 7.45% | 7.06% |
| DFA Emerging Markets Core Equity (Inst) (DFCEX) | 4.53% | 4.84% | 3.60% | 1.60% |
| Loomis Sayles Small Cap Growth (N) (LSSNX) | 8.05% | 9.83% | 7.12% | 6.59% |
| MFS Value (R6) (MEIKX) | 8.34% | 8.92% | 7.41% | 5.68% |
| Nuveen Equity Index (R6) (TIEIX) | 13.83% | 12.51% | 12.90% | 9.27% |
| Nuveen International Equity Index (R6) (TCIEX) | 4.83% | 5.38% | 3.90% | 2.14% |
| Victory Sycamore Established Value (R6) (VEVRX) | 11.11% | 10.80% | 10.18% | 7.56% |
| Average Percentage Difference | | | 8.91% | 6.32% |

### University of Michigan

| Fund | Annualized 5-Year Performance | Annualized 10-Year Performance | 5-Year Performance vs. TIAA Real Estate | 10-Year Performance vs. TIAA Real Estate |
|---|---|---|---|---|
| TIAA Real Estate Account (QREARX) | 0.93% | 3.24% | N/A | N/A |
| CREF Equity Index Account (R3) (QCEQIX) | 13.69% | 12.34% | 12.76% | 9.10% |
| CREF Global Equities Account (R3) (QCGLIX) | 11.30% | 9.64% | 10.37% | 6.40% |
| CREF Growth Account (R3) (QCGRIX) | 17.21% | 15.16% | 16.28% | 11.92% |
| CREF Stock Account (R3) (QCSTIX) | 10.28% | 9.64% | 9.35% | 6.40% |
| Nuveen Core Equity (R6) (TIGRX) | 15.05% | 13.01% | 14.12% | 9.77% |
| Nuveen Emerging Markets Equity (R6) (TEMLX) | -2.17% | 2.40% | -3.10% | -0.84% |
| Nuveen Emerging Markets Equity Index (R6) (TEQLX) | 1.19% | 3.40% | 0.26% | 0.16% |
| Nuveen Equity Index (R6) (TIEIX) | 13.83% | 12.51% | 12.90% | 9.27% |
| Nuveen International Equity (R6) (TIIEX) | 5.22% | 4.84% | 4.29% | 1.60% |
| Nuveen International Equity Index (R6) (TCIEX) | 4.83% | 5.38% | 3.90% | 2.14% |
| Nuveen Large Cap Growth (R6) (TILGX) | 16.56% | 15.15% | 15.63% | 11.91% |
| Nuveen Large Cap Growth Index (R6) (TILIX) | 18.91% | 16.71% | 17.98% | 13.47% |
| Nuveen Large Cap Value (R6) (TRLIX) | 9.94% | 8.50% | 9.01% | 5.26% |
| Nuveen Large Cap Value Index (R6) (TILVX) | 8.67% | 8.45% | 7.74% | 5.21% |
| Nuveen Mid Cap Growth (R6) (TRPWX) | 5.70% | 7.53% | 4.77% | 4.29% |
| Nuveen Mid Cap Value (R6) (TIMVX) | 7.69% | 6.91% | 6.76% | 3.67% |
| Nuveen Quant Small Cap Equity (R6) (TISEX) | 10.49% | 9.51% | 9.56% | 6.27% |
| Nuveen Real Estate Securities Select (R6) (TIREX) | 3.53% | 6.26% | 2.60% | 3.02% |
| Nuveen S&P 500 Index (R6) (TISPX) | 14.47% | 13.04% | 13.54% | 9.80% |
| Nuveen Small Camp Blend Index (R6) (TISBX) | 7.52% | 7.97% | 6.59% | 4.73% |
| Vanguard Emerging Markets Stock Index (Inst Plus) (VEMRX) | 3.04% | 4.05% | 2.11% | 0.81% |
| Vanguard Institutional Index (Inst Plus) (VIIIX) | 14.51% | 13.09% | 13.58% | 9.85% |
| Vanguard Mid Cap Index (Inst Plus) (VMCPX) | 9.87% | 9.57% | 8.94% | 6.33% |
| Vanguard Real Estate Index (Inst) (VGSNX) | 3.01% | 5.08% | 2.08% | 1.84% |
| Vanguard Total International Stock Index (Inst Plus) (VTPSX) | 4.32% | 5.11% | 3.39% | 1.87% |
| Vanguard Total Stock Market Index (Inst Plus) (VSMPX) | 13.82% | N/A | 12.89% | N/A |
| Average Percentage Difference | | | 8.40% | 5.77% |

197.    The TIAA Traditional Annuity and the TIAA Real Estate Account have also underperformed broad-based U.S. and international equity indexes over the last five and 10 years.

| Fund | Annualized 5-Year Performance | Annualized 10-Year Performance |
|---|---|---|
| TIAA Traditional Annuity - Retirement Choice | 4.23% | 4.20% |
| TIAA Real Estate Account (QREARX) | 0.93% | 3.24% |
| Rusell 2000 Index | 7.55% | 7.94% |
| MSCI ACWI Index | 10.58% | 9.79% |

198.    If TIAA and Morningstar had properly allocated ERISA plan participants' investments and recommended allocations based on common industry practices, those participants would have millions of dollars more in their retirement accounts because their assets would have been allocated more efficiently and to

57

other, better performing funds. Instead, by accepting the recommendations of the RAFV tool, the named Plaintiffs and the other members of the proposed Classes suffered a loss. Additionally, as discussed in detail above, participants are harmed by the illiquid nature of the TIAA Traditional Annuity, which will subject them to withdrawal penalties and restrictions if (like most retirees) they choose not to annuitize at retirement.

199.    Prudent investment advisors do not provide conflicted advice or engage in self-dealing.

200.    Prudent investment advisors recognize that participants receive no additional tax benefit from having tax-deferred annuities in a tax sheltered retirement plan.

201.    A prudent investment advisor would not advise participants to invest in the TIAA Traditional Annuity and the TIAA Real Estate Account without a much more careful consideration of their individual circumstances, if at all.

202.    Defendants were imprudent to assume that every participant would benefit from investing in high-cost, low-return investment vehicles like the TIAA Traditional Annuity and the TIAA Real Estate Account. Among other things, they should have considered that for younger participants, allocating contributions to those investments and away from higher-returning equity funds would likely result in significantly reduced savings at retirement. And they should not have assumed that participants will choose to annuitize the TIAA Traditional Annuity at retirement, as most investors do not.

58

203.    It was imprudent for Defendants to program the RAFV tool to assume that participants will annuitize their TIAA Traditional investments, when Defendants were well aware that the vast majority of participants do not annuitize at retirement.

204.    Defendants were also imprudent for failing to consider the illiquid nature of the TIAA Traditional Annuity and how its restrictions on withdrawals might impact participants' changing preferences and liquidity needs.

205.    Defendants also should have considered that some older participants near retirement would not benefit from a direct investment in the TIAA Real Estate Account. Prudent fiduciaries recognize that funds focused on a particular market sector, like real estate, are often not suitable for a retirement plan, and that participants can be more prudently exposed to those markets through other diversified investment vehicles, like a target date fund. If a real estate fund is recommended, a prudent investment advisor would generally favor a real estate equity fund, with liquid investments in public companies and REITs, rather than the TIAA Real Estate Account, which generally produces lower returns more typical of a bond fund because of its significant cash holdings.

206.    It was also imprudent for Defendants to recommend at least an 8% allocation to the TIAA Real Estate Account for every participant without considering whether they might be overexposed to the commercial real estate market based on the other investments in their portfolios (both within the plan and out of the plan).

59

207.    Prudent investment advisors compare investment alternatives, evaluating their short- and long-term performance history, fees, manager tenure, and relative risk. Defendants did not consider *any* alternatives to the TIAA Traditional Annuity or the TIAA Real Estate Account when making their recommendations to participants in TIAA's RA and RPPM services.

208.    A prudent investment advisor also would have recognized that the fees charged by the RPPM managed account service were not reasonable for the services provided. There was functionally no difference in the advice provided by Defendants in the RA and RPPM programs, which both utilized the RAFV tool, yet the RPPM managed account charges additional high fees. Regardless of which service they chose, participants were required to periodically update their information with any financial changes. Participants would have been better off in a lower-cost alternative, such as a target date fund or a balanced fund.

**H.    Defendants have unjustly profited from the scheme at participants' expense.**

209.    As a result of the unlawful scheme described herein, Defendants have been unjustly enriched.

210.    Plan participants who have agreed to adopt the RAFV tool's investment recommendations have been charged higher fees for products and services that underperformed comparable alternatives available through their employers' tax-favored plans.

211.    TIAA has directly benefited from receiving those higher fees, as well as from the resulting increase in assets under management in the TIAA Traditional Annuity and the TIAA Real Estate Account.

212.    In 2023, "advice implementations" using the tool were up 34% from the year before, resulting in more than $400 million in new investments to the TIAA Traditional Annuity.

213.    The new in-flows to TIAA's proprietary annuities have directly resulted in increased profits to TIAA.

214.    Morningstar has also benefited from the fees it receives as a subadvisor to the RA and RPPM services.

## VII.  LEGAL STANDARDS

### A.    Defendants act as ERISA fiduciaries in connection with the RAFV tool recommendations.

215.    Plaintiffs bring this action on behalf of themselves and similarly situated participants in ERISA-governed defined contribution retirement plans, as well as participants in non-ERISA plans.

216.    ERISA-governed plans are required to adopt and maintain a written plan document that identifies one or more "named fiduciaries" with authority to control and manage the operation and administration of the plan. *See* 29 U.S.C. § 1102(a)(1).

217.    In addition to those fiduciaries named in the plan document, ERISA also extends fiduciary status to those who undertake certain plan-related functions.

218.    "The term 'fiduciary' is to be liberally interpreted to effect the statute's remedial purpose, and the courts have taken a broad view in deciding whether a particular service provider should be considered a fiduciary under ERISA." *Lowen v. Tower Asset Mgmt.*, 653 F. Supp. 1542, 1550 (S.D.N.Y. 1987) (internal marks and citation omitted).

219.    Under ERISA, "a person is a fiduciary with respect to a plan to the extent ... he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so[.]" 29 U.S.C. § 1002(21)(A)(ii).

220.    TIAA and Morningstar are fiduciaries with respect to TIAA Retirement Advisor and TIAA Retirement Plan Portfolio Manager. Each time they advise ERISA plan participants how they should invest their plan accounts, Defendants render investment advice, either directly or through an affiliate, with respect to ERISA plan moneys. *See* 29 U.S.C. § 1002(21)(A)(ii).

221.    Defendants receive a fee or other compensation, direct or indirect, for providing that advice. The investment advice provided through Retirement Advisor is included in the bundle of services for which TIAA is compensated through the administrative fees it collects from each plan. In its role as subadvisor, Morningstar also receives a portion of those fees, indirectly, from TIAA. Likewise, each time a participant follows Defendants' investment advice by enrolling in Retirement Plan Portfolio Manager, Defendants receive substantial fees.

222.    TIAA acknowledges that its financial consultants (i.e., TC Services and its advisors) have a fiduciary obligation under the Investment Advisers Act of 1940 when providing registered investment advisory services. *See* Mar. 28, 2024 TC Services – Advice & Planning Services Form ADV Part 2A at 4.

223.    Similarly, TIAA acknowledges that TIAA Trust has a fiduciary duty to clients under federal and state laws that apply to the investment management services it provides for clients who utilize TIAA's managed account services. *Id.*

224.    TIAA further acknowledges that when its financial professionals are providing broker-dealer services, including recommendations for "how to allocate assets within [an] employer sponsored retirement plan," they are also "subject to a fiduciary standard of conduct under other federal laws and our internal policies," as well as some state laws. *Id.* at 6–7.

225.    TIAA admits that its advisors operate under a conflict of interest when recommending TIAA proprietary products and services, and that "these conflicts ... can affect the investment advice and recommendations we provide to you." *Id.* at 6–7. However, TIAA assures regulators and the general public, "we operate under impartial conduct standards and internal policies and procedures that require us to act in your best interest and not put our interests ahead of yours. When we provide investment advice to you regarding your plan(s), we are fiduciaries within the meaning of the [Internal Revenue Code] and ERISA, as applicable." *Id.* at 6.

226.    TIAA also assumes ERISA 3(38) fiduciary responsibility as an "investment manager" for its Retirement Plan Portfolio Manager services.[31] *See* 29 U.S.C. § 1002(38).

## B.    ERISA fiduciaries must act prudently and exclusively in the best interests of plan participants.

227.    ERISA imposes strict standards of conduct on plan fiduciaries. To effectuate ERISA's primary purpose of protecting the retirement security of plan participants, "Congress commodiously imposed fiduciary standards on persons whose actions affect the amount of benefits retirement plan participants will receive." *John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 96 (1993). ERISA's fiduciary standards of prudence and loyalty are derived from the common law of trusts and are "*the highest known to the law*." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982) (emphasis added).

228.    Most fundamentally, ERISA fiduciaries are subject to an unyielding duty of loyalty. *See Pegram v. Herdrich*, 530 U.S. 211, 224–25 (2000). The statute states in relevant part that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). Put simply, the fiduciary must act "with an eye single to the interests of the participants

---

[31] *See* TIAA Retirement Plan Portfolio Manager Plan sponsor FAQs at 6, available at https://www.tiaa.org/public/pdf/RPPM_Plan_Sponsor_FAQs_194033.pdf.

and beneficiaries." *Donovan*, 680 F.2d at 271 (citing Rest. of Trusts 2d § 170 (1959), II Scott on Trusts § 170, at 1297–99 (1967), and Bogert, The Law of Trusts and Trustees § 543 (2d ed. 1978)).

229.    A fiduciary must also act prudently—"with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). To fulfill this duty, the fiduciary must investigate and evaluate investments and exercise the sound judgment of a knowledgeable and impartial financial expert in making investment decisions or formulating investment advice.

230.    The duty of prudence extends to the selection and monitoring of service providers, such as recordkeepers. *See Hughes v. Nw. Univ.*, 142 S. Ct. 737, 741 (2022).

231.    The personal data of a plan's participants is highly sensitive and confidential. It includes personal investment choices made by each participant, asset balances in funds, total aggregate funds, Social Security numbers, years until retirement, and other sensitive information. It is only acquired because of the recordkeeper's role tracking investments, balances, and other such information.

232.    Fiduciaries entrusted with sensitive participant data must exercise the highest care to ensure its safety and security. For example, it is indisputable that fiduciaries could not, consistent with ERISA's strict duties of prudence and loyalty, sell participants' Social Security numbers to the highest bidder or auction off information about participants' retirement accounts. It follows that they may not

65

allow third-party service providers to abuse their access to such sensitive data to enrich themselves through misleading or predatory sales tactics.

233. In addition to any liability a fiduciary may have for its own breach, a fiduciary can also be liable for knowingly participating in, concealing, or failing to remedy a co-fiduciary's breach of duty. *See* 29 U.S.C. § 1105(a). A fiduciary cannot turn a blind eye to the breach of its co-fiduciary.

234. To supplement the general fiduciary duty of loyalty, Congress also prohibited *per se* certain transactions deemed likely to injure a plan, including self-dealing transactions and transactions with "parties in interest," defined to include "those entities that a fiduciary may be inclined to favor at the expense of the plan beneficiaries." *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–42 (2000); 29 U.S.C. § 1106(a)–(b). An entity providing services to a plan is a party in interest. 29 U.S.C. § 1002(9), (14)(B).

235. Although certain otherwise prohibited transactions may be eligible for an exemption, the necessary conditions for relief generally require the fiduciary to show that the transaction serves the participants' interests rather than the fiduciary's or service provider's interests and involves no more than reasonable compensation.

## C. Participants can enforce fiduciary obligations through actions to recover losses and ill-gotten profits.

236. To enforce ERISA's fiduciary obligations, Congress authorized participants to bring a civil action to obtain legal and equitable remedies for their

plans. 29 U.S.C. § 1132(a)(2). The relief available in a § 1132(a)(2) action includes restoration of plan losses caused by the breach or violation, as well as restoration to the plan of "any profits of such fiduciary" made "through use of assets of the plan by the fiduciary." 29 U.S.C. § 1109(a).

237.    ERISA further authorizes participants "to obtain other appropriate equitable relief (i) to redress such violations [of any provision of this subchapter] or (ii) to enforce any provisions of this subchapter," 29 U.S.C. § 1132(a)(3). Appropriate equitable relief includes monetary remedies such as surcharge, disgorgement of profits, and a constructive trust. *See* 29 U.S.C. § 1109(a).

238.    Even after a participant's assets are distributed from the plan, the participant retains statutory standing to pursue actions to impose a constructive trust on ill-gotten profits realized from a breach of the duty of loyalty, and the proceeds of the constructive trust are properly distributed to the participants. *See Amalgamated Clothing*, 861 F.2d at 1409–19. "The key to removing a fiduciary's financial incentive to breach his duty of loyalty is to make sure that the fiduciary is not allowed to keep any ill-gotten profits." *Id.* at 1412.

**D.    New York State common law regulates TIAA's conduct with respect to non-ERISA plans.**

239.    ERISA does not apply to governmental plans, like those offered to state and municipal employees. 29 U.S.C. § 1003(b)(1), (2); 29 U.S.C. § 1002(32) (defining "governmental plan"). This means that plans sponsored by public colleges and universities are exempt from Title I of ERISA, including the law's fiduciary

obligations. Nevertheless, TIAA's conduct with respect to its non-ERISA plan clients is still subject to a fiduciary standard under New York common law.

240.    TIAA has acknowledged in writing that it operates under the same fiduciary standard when servicing non-ERISA plans. "Certain employer retirement plans (like governmental plans) are not covered by ERISA and its impartial conduct standards. However, our internal policies and procedures require us to adhere to the same fiduciary standard and requirements when we provide you with these types of recommendations."[32]

241.    Fiduciaries like TIAA who operate in New York are held "to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928) (Cardozo, J.). The requirements of New York law mandate prudence and loyalty, duties essentially the same as those under ERISA.

242.    **Undivided & Undiluted Loyalty**. In New York, "it is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect." *Birnbaum v. Birnbaum*, 539 N.E.2d 574, 576 (N.Y. 1989). "This is a sensitive and 'inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." *Id.* "Included within this rule's broad scope is every situation in which a fiduciary,

---

[32] 3/28/2024 TC Services – Advice & Planning Services Form ADV Part 2A at 6.

who is bound to single-mindedly pursue the interests of those to whom a duty of loyalty is owed, deals with a person 'in such close relation to the fiduciary that possible advantage to such other person might consciously or unconsciously' influence the fiduciary's judgment." *Id.* (quoting *Albright v. Jefferson Cnty. Nat'l Bank*, 53 N.E.2d 753, 756 (N.Y. 1944)) (alterations adopted).

243.    **Prudence and Care**. New York law further binds the fiduciary of a trust "'to employ such diligence and prudence in the care and management of the trust, as in general, prudent persons of discretion and intelligence in such matters, employ in their own like affairs.'" *In re Bank of N.Y. (Blumenkrantz)*, 148 N.Y.S.3d 83, 85 (App. Div., 1st Dep't 2021) (quoting *In re Estate of Janes*, 681 N.E.2d 332, 3336 (N.Y. 1997)) (alterations adopted). The "fiduciary duty of care obligates fiduciaries to act in an informed and reasonably diligent basis in considering material information." *Larsen v. Larsen*, Index No. 512169/2022, 2023 N.Y. Misc. LEXIS 2385, at *5 (Sup. Ct., Kings Cnty. May 9, 2023) (internal marks and citation omitted).

244.    In New York, entities like Morningstar who aid and abet a breach of a fiduciary duty are liable for that breach as well, even if they had no independent fiduciary obligation to the allegedly injured party, "if the alleged aider and abettor rendered 'substantial assistance' to the fiduciary in the course of effecting the alleged breaches of duty.'" *1650 B'way Assoc., Inc. v. Sturm*, 210 N.Y.S.3d 19, 23 (App. Div., 1st Dep't 2024) (quoting *Caprer v. Nussbaum*, 825 N.Y.S.2d 55 (App. Div., 2d Dep't 2006)). Substantial assistance occurs when a defendant affirmatively

assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Smallberg v. Raich Ende Malter & Co., LLP*, 35 N.Y.S.3d 134, 137 (App. Div., 2d Dep't 2016) (internal quotation marks and citations omitted).

### E.    Broker-dealers like TIAA must act in the best interest of their customers.

245.    In 2010, Congress enacted the Dodd-Frank Act. Section 913 of the Act "authorize[s] the SEC to promulgate new standards of conduct for broker-dealers and investment advisors." *XY Planning Network, LLC v. SEC*, 963 F.3d 244, 249 (2d Cir. 2020). Congress directed that "the standard of conduct for all brokers, dealers, and investment advisers, when providing personalized investment advice about securities to retail customers, shall be to act in the best interest of the customer without regard to the financial or other interest of the broker, dealer, or investment advisor providing the advice." *Id.* (cleaned up).

246.    "Regulation Best Interest imposes a 'best-interest obligation' on broker-dealers, requiring them to 'act in the best interest of the retail customer at the time the recommendation is made, without placing the financial or other interest of the broker-dealer ahead of the interest of the retail customer.'" *Id.* (quoting 17 C.F.R. § 240.15*l*-1) (alterations adopted).

247.    The best-interest obligation has four components, as follows:

(1)    a "**disclosure obligation**," requiring broker-dealers to disclose any material facts relating to the scope and terms of the

relationship with the customer, as well as material conflicts of interest related to their investment recommendations;

(2)   a "**care obligation**," requiring broker-dealers to "have a reasonable basis to believe that the recommendation is in the best interest of" the customer;

(3)   a "**conflict of interest obligation**," requiring broker-dealers to identify, mitigate, and disclose conflicts of interest and to "prevent" conflicts that would cause them to "make recommendations that place their own interest ahead of the customers"; and

(4)   a "**compliance obligation**," requiring broker-dealers to adopt policies and practices "reasonably designed to achieve compliance with Regulation Best Interest."

*XY Planning*, 963 F.3d at 249 (quoting 17 C.F.R. § 240.15*l*-1) (alterations adopted).

248.   TIAA is a broker-dealer covered by the Act. *See* 12 U.S.C. § 5381.

## VIII.   CLASS ACTION ALLEGATIONS

249.   Plaintiffs seek to certify, and to be appointed as representatives of, the following classes:

> **Class 1**: All participants of defined contribution plans subject to ERISA who initiated or increased an allocation of their plan assets to the TIAA Traditional Annuity and/or the TIAA Real Estate Account at any time between August 5, 2018 and the date of judgment, based on the advice of the RAFV tool. Excluded from the class are participants of any plan sponsored by TIAA or its affiliates.

**Class 2**: All participants of defined contribution plans <u>not</u> subject to ERISA who initiated or increased an allocation of their plan assets to the TIAA Traditional Annuity and/or the TIAA Real Estate Account at any time between August 5, 2018 and the date of judgment, based on the advice of the RAFV tool. Excluded from the class are participants of any plan sponsored by TIAA or its affiliates.

250. The proposed classes each meet the requirements of Rule 23(a) for the following reasons:

a. Each class includes thousands of members and is so large that joinder of all its members is impracticable.

b. There are questions of law and fact common to each class. For Class 1, these include, without limitation, whether Defendants are fiduciaries to the ERISA-governed plans with respect to the conduct that is the subject of this complaint; whether Defendants breached a fiduciary duty; whether Defendants caused a prohibited transaction; whether Defendants knowingly participated in ERISA violations by other fiduciaries; determining the proper remedies for Defendants' violations; and determining the amount of Defendants' unlawful profits.

c. For Class 2, the common questions of law and fact include, without limitation, whether TIAA violated a fiduciary duty it owed to the non-ERISA plans with respect to the at-issue conduct; whether TIAA knowingly participated in breaches by other fiduciaries; whether

Morningstar substantially assisted TIAA's fiduciary violations; determining the proper remedies for Defendants' unlawful conduct; and determining the amount of Defendants' unlawful profits.

d. Plaintiffs' claims are typical of the claims of each class because each Plaintiff and all members within each class are pursuing the same legal theories arising from the same course of misconduct instituted on a company-wide basis by TIAA's top executives.

e. Plaintiffs are adequate class representatives because they have no interests that conflict with the members of either class, are committed to the vigorous representation of the two classes, and have engaged experienced and competent attorneys to represent the interests of the other class members.

251. Prosecution of separate actions by individual members would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties and liability, and (B) adjudications by individual members would, as a practical matter, be dispositive of the interests of the members not parties to the adjudication or would substantially impair or impede those members' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

252. A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all class members is

73

impracticable, the losses suffered by individuals may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, the classes may be certified under Rule 23(b)(3) if they are not certified under Rule 23(b)(1)(A) or (B).

253.    Plaintiffs' counsel, Schlichter Bogard LLP, is the firm best able to fairly and adequately represent the interests of both classes. Fed. R. Civ. P. 23(g).

254.    Schlichter Bogard pioneered fiduciary breach cases under ERISA in 401(k) and 403(b) plans. *Kelly v. Johns Hopkins Univ.*, No. 16-2835, 2020 U.S. Dist. LEXIS 14772, at *4 (D. Md. Jan. 28, 2020). The firm handled the first full trial of an ERISA excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 157428, at *10 (W.D. Mo. Nov. 2, 2012), *vacated on other grounds*, 746 F.3d 327 (8th Cir. 2014). Following remand, the district court again awarded Plaintiffs' attorney's fees, emphasizing the significant contribution Plaintiffs' attorneys have made to ERISA litigation, including

educating the Department of Labor and federal courts about the importance of monitoring fees in retirement plans:

> Of special importance is the significant national contribution made by the Plaintiffs, whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations.

*Tussey v. ABB, Inc.*, No. 06-4305, 2015 U.S. Dist. LEXIS 164818, at *8 (W.D. Mo. Dec. 9, 2015), *vacated on other grounds*, 850 F.3d 951 (8th Cir. 2017).

255.    Schlichter Bogard was also class counsel in *Tibble v. Edison International*, 135 S. Ct. 1823 (2015) and *Hughes v. Northwestern University*, 595 U.S. 170, 172, 142 S. Ct. 737, 739 (2022), the only two Supreme Court cases to address excessive fees in a defined contribution plan, both of which resulted in unanimous decisions in favor of plaintiffs.

256.    In over 30 class actions involving fiduciary misconduct in defined contribution plans, federal district judges throughout the country have consistently recognized the firm's unparalleled success in the area of defined contribution plan litigation. *See, e.g., Marshall v. Northrop Grumman Corp.*, No. 16-6794, 2020 U.S. Dist. LEXIS 177056, at *11 (C.D. Cal. Sept. 18, 2020) ("The Court finds that Schlichter, Bogard & Denton is exceptionally skilled having achieved unparalleled success in actually pioneering complex ERISA 401(k) excessive fee litigation[.]");*Bell v. Pension Comm. of ATH Holding Co.*, No. 15-2062, 2019 U.S. Dist. LEXIS 150302, at *4 (S.D. Ind. Sept. 4, 2019); *Spano v. Boeing Co.*, No. 06-743, 2016 U.S. Dist.

LEXIS 161078, at *9 (S.D. Ill. Mar. 31, 2016) ("The law firm Schlichter, Bogard & Denton has significantly improved 401(k) plans across the country by bringing cases such as this one[.]") (internal quotations omitted); *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 U.S. Dist. LEXIS 12037, at *8 (S.D. Ill. Jan. 31, 2014) ("Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination."); *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S. Dist. LEXIS 166816, at *8 (N.D. Ill. June 26, 2012) ("It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area."); *Will v. General Dynamics Corp.*, No. 06-698, 2010 U.S. Dist. LEXIS 123349, at *8 (S.D. Ill. Nov. 22, 2010) ("Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees.").

## IX.  CAUSES OF ACTION

### COUNT I: Breach of the Fiduciary Duty of Loyalty
### 29 U.S.C. § 1104(a)(1)(A); 29 U.S.C. § 1109(a)

257.   Plaintiffs restate and incorporate herein the allegations contained in the preceding paragraphs.

258.   This count is brought by **Plaintiffs Kelley and Barajas** and the other members of **Class 1** against **all Defendants**.

76

259. Based on the facts alleged above, Defendants are fiduciaries when providing investment advice to ERISA plan participants. 29 U.S.C. § 1002(21)(A)(ii).

260. As fiduciaries, Defendants are required to act "solely in the interest of the participants and beneficiaries[.]" 29 U.S.C. §1104(a)(1)(A); *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982).

261. Defendants breached their fiduciary duty of loyalty when they provided investment advice based on the RAFV tool to Plaintiffs Kelley and Barajas and the other members of Class 1.

262. As explained above, recommending certain allocations to the TIAA Traditional Annuity and the TIAA Real Estate Account was disloyal, because it placed TIAA's self-serving business interests ahead of what was best for plan participants.

263. Defendants' breaches of the ERISA duty of loyalty resulted in losses to Plaintiffs Kelley and Barajas and the members of Class 1.

264. As a result of their breaching conduct, Defendants are liable under ERISA for damages and equitable remedies, including disgorgement of profits or a constructive trust. *See* 29 U.S.C. §1109(a), §1132(a)(2), and §1132(a)(3).

265. Each Defendant also knowingly participated in, enabled, and concealed each other's disloyal conduct, knowing the other's actions and omissions were a breach and failing to make reasonable efforts under the circumstances to remedy the breach. Accordingly, each Defendant is subject to co-fiduciary liability. *See* 29 U.S.C. §1105(a).

## COUNT II: Breach of the Fiduciary Duty of Prudence
### 29 U.S.C. § 1104(a)(1)(A); 29 U.S.C. § 1109(a)

266. Plaintiffs restate and incorporate herein the allegations contained in the preceding paragraphs.

267. This count is brought by **Plaintiffs Kelley and Barajas** and the other members of **Class 1** against **all Defendants**.

268. Based on the facts alleged above, Defendants are fiduciaries when providing investment advice to ERISA plan participants. 29 U.S.C. § 1002(21)(A)(ii).

269. As fiduciaries, Defendants are required to abide ERISA's duty of prudence when recommending investments. *See* 29 U.S.C. §1104(a)(1)(B).

270. Defendants breached their fiduciary duty of prudence when they provided investment advice based on the RAFV tool to Plaintiffs Kelley and Barajas and the other members of Class 1.

271. As explained above, Defendants acted imprudently in recommending certain allocations to the TIAA Traditional Annuity and the TIAA Real Estate Account to every participant. They failed to account for participants' individualized needs and failed to consider alternatives. It was also imprudent to recommend investment options based on TIAA's business needs rather than what was best for each participant.

272. Defendants' breaches of the ERISA duty of prudence resulted in losses to Plaintiffs Kelley and Barajas and the members of Class 1.

273.    As a result of their breaching conduct, Defendants are liable under ERISA for damages and equitable remedies, including disgorgement of profits or a constructive trust. *See* 29 U.S.C. §1109(a), §1132(a)(2), and §1132(a)(3).

274.    Each Defendant also knowingly participated in, enabled, and concealed each other's disloyal conduct, knowing the other's actions and omissions were a breach and failing to make reasonable efforts under the circumstances to remedy the breach. Accordingly, each Defendant is subject to co-fiduciary liability. *See* 29 U.S.C. §1105(a).

### COUNT III: Prohibited Transactions
### 29 U.S.C. § 1106(b)(1)

275.    Plaintiffs restate and incorporate herein the allegations contained in the preceding paragraphs.

276.    This count is brought by Plaintiffs Kelley and Barajas and the other members of Class 1 against TIAA, TC Services, and TIAA Trust.

277.    Based on the facts described above, TIAA and TC Services are fiduciaries when providing investment advice to ERISA plan participants in the Retirement Advisor program. 29 U.S.C. § 1002(21)(A)(ii).

278.    Based on the facts described above, TIAA and TIAA Trust are fiduciaries when providing managed account services to ERISA plan participants in the Retirement Plan Portfolio Management program. 29 U.S.C. § 1002(38).

279.    ERISA prohibits self-dealing transactions between a plan and a fiduciary. 29 U.S.C. § 1106(b).

280.    Based on the facts described above, TIAA, TC Services, and TIAA Trust dealt with ERISA plan assets in their own interest and for their own account, in violation of 29 U.S.C. § 1106(b)(1), by causing assets in ERISA plan accounts belonging to Plaintiffs Kelley and Barajas and other Class 1 members to move out of other investments and into the TIAA Traditional Annuity and/or the TIAA Real Estate Account, to further TIAA's business interests.

281.    TIAA, TC Services, and TIAA Trust materially benefited from their self-interested, prohibited transactions, and no statutory or regulatory exemption applies.

282.    TIAA, TC Services, and TIAA Trust are liable for all losses suffered by Plaintiffs Kelley and Barajas, the other members of Class 1, and their respective plans as a result of these prohibited transactions. 29 U.S.C. § 1109(a), § 1132(a)(2), and § 1132(a)(3). All profits made through the use of ERISA plan assets or realized as a result of their self-dealing are also subject to disgorgement or a constructive trust. *Id.*

283.    Based on the facts described above, TIAA, TC Services, and TIAA Trust each knowingly participated in, concealed, and failed to remedy the prohibited transactions caused by the other, making them each liable for the others' breaches as a co-fiduciary. *See* 29 U.S.C. § 1105(a).

## COUNT IV: Unlawful Receipt of Ill-Gotten Profits
### 29 U.S.C. § 1132(a)(3)

284.   Plaintiffs restate and incorporate herein the allegations contained in the preceding paragraphs.

285.   This count is brought by **Plaintiffs Kelley and Barajas** and the other members of **Class 1** against **all Defendants**.

286.   The Plan Sponsors of the plans in which Plaintiffs Kelley and Barajas and the other Class 1 members participate are named fiduciaries or functional fiduciaries under ERISA based on, among other things, hiring TIAA as their plans' recordkeeper. As such, the Plan Sponsors owed duties of loyalty and prudence to the plans and plan participants and were bound by ERISA's prohibited transactions provisions, which render *per se* unlawful certain transactions between their plans and party-in-interest service providers like TIAA.

287.   The Plan Sponsors breached their fiduciary duty of prudence by allowing Defendants to execute the unlawful scheme described herein at the expense of their plan participants.

288.   The facts described herein support a reasonable inference that the Plan Sponsors did not conduct an adequate investigation of the RA and RPPM services before imprudently promoting them to their plan participants as a source of unbiased, independent investment advice.

289.    Prudent fiduciaries would have discovered through diligent investigation that TIAA was steering plan assets to its own proprietary products through the RA and the RPPM programs.

290.    Through their imprudence, Plan Sponsors failed to protect the plan assets of Plaintiffs Kelley and Barajas and the other members of Class 1 from TIAA's repeated self-dealing. Prudent fiduciaries would have taken steps to shield participants from TIAA's predatory practices, such as (a) warning participants that the TIAA financial consultants were incentivized to recommend TIAA products; (b) educating participants about the risks associated with investing in the TIAA Traditional Annuity and the TIAA Real Estate Account; and (c) monitoring TIAA's sales practices through the RA and RPPM programs.

291.    Plan Sponsors also should have known that by allowing Defendants to execute the unlawful scheme described herein, they were causing their plans to engage in ERISA prohibited transactions.

292.    Each time a participant accepted Defendants' investment advice recommendations in the RA and the RPPM programs, plan assets in the participant's account were directly or indirectly transferred to TIAA, which—as the plan's recordkeeper—was a "party in interest" within the meaning of ERISA. 29 U.S.C. § 1002(14)(B).

293.    As described above, those transfers were unlawfully initiated for TIAA's benefit, making them prohibited transactions under 29 U.S.C. § 1106(a)(1)(D).

82

294.    The RA and RPPM services offered by TIAA were not necessary for the establishment or operation of the plan and were not exempt from ERISA's prohibited transaction rule. *See* 29 U.S.C. § 1108(b)(2)(A).

295.    Defendants received fees and earned profits under the RA and RPPM programs as a direct result of the Plan Sponsors' fiduciary breaches.

296.    Under 29 U.S.C. § 1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. Fiduciary status is not a prerequisite to liability.

297.    Under ERISA's trust law roots, "it has long been settled that when a trustee in breach of his fiduciary duty to the beneficiaries transfers trust property to a third person, the third person takes the property subject to the trust, unless he has purchased the property for value and without notice of the fiduciary's breach of duty. The trustee or beneficiaries may then maintain an action for restitution of the property (if not already disposed of) or disgorgement of proceeds (if already disposed of), and disgorgement of the third person's profits derived therefrom." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 250 (2000) (citing *inter alia* Rest. (2d) of Trusts §§ 284, 291, 294, 295, 297 (1959)). Accordingly, non-fiduciaries who receive ill-gotten proceeds are subject to equitable relief, including restitution and disgorgement, if they had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful. *Id.*

298.    TIAA knew or should have known that Plan Sponsors were in breach of their fiduciary obligations to Class 1 members by allowing TIAA to self-servingly

steer their assets into TIAA products, and by promoting the RA and RPPM services to plan participants without understanding that they were designed to advance TIAA's financial interests over the interests of participants.

299.    TIAA directly participated in and enabled the Plan Sponsors' fiduciary breaches by engaging in unchecked self-dealing using the RAFV tool, knowingly receiving transfers of plan assets in prohibited transactions, and by failing to disclose to Plan Sponsors that its financial consultants were engaging in false and misleading practices.

300.    As the developer of the RAFV tool and the subadvisor to the RA and RPPM programs, Morningstar knew or should have known that TIAA was engaged in self-dealing, and by extension, that the Plan Sponsors were imprudently failing to prevent TIAA from misusing plan assets for its own self-interest.

301.    Accordingly, Defendants have knowingly received fees and profits resulting from Plan Sponsors' ERISA violations.

302.    In this Count, Plaintiffs Kelley and Barajas and the other Class 1 members seek to recoup Defendants' ill-gotten gains through equitable remedies under 29 U.S.C. § 1132(a)(3), such as restitution, disgorgement, or a constructive trust.

## COUNT V: Breach of Common Law Fiduciary Duty
### New York Common Law

303.    Plaintiffs restate and incorporate herein the allegations contained in the preceding paragraphs.

84

304. This count is brought by **Plaintiffs Englund**, **Lightner, and Dupree** and the other members of **Class 2** against **all Defendants**.

305. As a corporate entity domiciled in New York, TIAA is subject to New York law when making investment recommendations to its RA and RPPM customers.

306. Based on the facts alleged above, TIAA acts as a fiduciary under New York common law when it provides investment advice to non-ERISA plan participants using the RAFV tool.

307. As a broker-dealer, TIAA has a legal duty to "act in the best interest of the retail customer at the time the recommendation is made, without placing the financial or other interest of the [broker-dealer] ahead of the interest of the retail customer." 17 C.F.R. § 240.15*l*-1.

308. Under New York law, it is well settled that "[a] fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Plaintiffs' State & Sec. Law Settlement Class Counsel v. Bank of N.Y. Mellon*, 2014 NY Slip Op 24106, ¶¶ 6–7, 43 Misc. 3d 887, 896, 985 N.Y.S.2d 398, 405–06 (Sup. Ct.) (quoting *EBC I, Inc. v Goldman, Sachs & Co.*, 5 NY.3d 11, 19, 832 N.E.2d 26, 799 NYS.2d 170 (2005), quoting in turn Rest. (2d) of Torts § 874, comment a).

309. TIAA breached its common law fiduciary duties of loyalty and prudence when it provided investment advice based on the RAFV tool to Plaintiffs Englund, Lightner, and Dupree and the other members of Class 2.

310.    As explained above, recommending certain allocations to the TIAA Traditional Annuity and the TIAA Real Estate Account to every participant was disloyal and imprudent. TIAA placed its own self-serving business interests ahead of what was best for plan participants.

311.    TIAA's breaches of the common law fiduciary duties of prudence and loyalty directly and proximately caused monetary losses to Plaintiffs Englund, Lightner, and Dupree and the members of Class 2, who changed their investments in reliance on TIAA's imprudent and disloyal advice. But for TIAA's breaching conduct, the plan assets they invested in the TIAA Real Estate Account and/or the TIAA Traditional Annuity would have been invested in lower-cost, higher performing funds, resulting in greater investment earnings than they have otherwise obtained.

312.    Morningstar is also liable for aiding and abetting TIAA's breaches by supplying the recommendations for the RA and RPPM programs. In developing the model portfolios for the RAFV tool, Morningstar has knowingly provided substantial assistance to TIAA's self-serving and disloyal scheme by creating two new asset categories that it does not normally consider appropriate for investors outside TIAA recordkept plans. In doing so, Morningstar knows that it has ensured one or more of TIAA's proprietary products will be recommended to every participant who utilizes the RAFV tool, regardless of the participant's particular needs.

313.    Morningstar also knows that TIAA is subject to fiduciary standards in providing the investment advice produced by the RAFV tool, and that TIAA is using

the RAFV tool to steer plan assets into its proprietary financial products to advance its own business interests, in breach of its fiduciary duty of loyalty to participants.

314.    Plaintiffs Englund, Lightner, and Dupree seek damages resulting from Defendants' breaching conduct on behalf of themselves and the other Class 2 members.

## JURY TRIAL DEMANDED

315.    Under Rule 38 of the Federal Rules of Civil Procedure and the Constitution of the United States, Plaintiffs demand a trial by jury. In the alternative, Plaintiffs request an advisory jury on all issues not triable of right by a jury.

## PRAYER FOR RELIEF

Plaintiffs seek entry of judgment on each of their claims and request that the Court order the following relief:

- Find and declare Defendants liable as alleged above;

- Find and adjudge that Defendants are personally liable to make good to the affected plans all losses resulting from each breach of fiduciary duty and to otherwise restore the plans to the position they would have occupied but for the breaches of fiduciary duty;

- Determine the method by which plan losses under 29 U.S.C. § 1109(a) should be calculated;

- Grant appropriate equitable relief against all Defendants, including without limitation disgorgement or a constructive trust on ill-gotten

profits, restitution, and surcharge against Defendants and in favor of Plaintiffs and the members of each class;

- Order Defendants to provide all accountings necessary to determine the amounts of Defendants' profits and the amounts that must be restored to Plaintiffs and class members and their respective plans;

- Order Defendants to stop the practices described above and to notify, in a manner directed by this Court, each class member that this Court has so ordered;

- Certify each proposed class, appoint each of the Plaintiffs as a representative of their respective class, and appoint Schlichter Bogard LLP as class counsel;

- Award to the Plaintiffs and the class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant other equitable relief as the Court deems appropriate.

January 10, 2024   Respectfully submitted,

       */s/* Nathan D. Stump
       Andrew D. Schlichter, Bar No. 4403267
       Jerome J. Schlichter*
       Sean E. Soyars*
       Nathan D. Stump*
       Joel D. Rohlf*
       Patrick Kutz*
       Terrence W. Scudieri, Jr., Bar No. 5761945
       SCHLICHTER BOGARD LLP
       100 South Fourth Street, Ste. 1200
       St. Louis, MO 63102
       (314) 621-6115
       Fax: (314) 621-5934
       aschlichter@uselaws.com
       jschlichter@uselaws.com
       ssoyars@uselaws.com
       nstump@uselaws.com
       jrohlf@uselaws.com
       pkutz@uselaws.com
       tscudieri@uselaws.com

       *Admitted *pro hac vice*

       *Counsel for Plaintiffs*